# CHARLESTON.

## NICELY v. NICELY.

Submitted October 30, 1917.    Decided November 6, 1917.

1. EVIDENCE—*Witnesses—Putting in Whole Evidence—Impeachment.*
    Where on a bill for divorce by husband against wife the evidence tends to show a conspiracy inaugurated either by the plaintiff or by another to entrap the defendant and to place her in some situation or under such circumstances as will furnish grounds for charging her with adulterous conduct, and the evidence of any of those engaged therein is relied on by the plaintiff, the defendant is entitled to put in evidence all the facts and circumstances connected with such conspiracy, not only on the question of her guilt or innocence, but as tending to impeach the testimony of the inculpating witnesses against her.   (p. 270).

2. DIVORCE—*Adultery—Proof.*
    Though circumstantial evidence is admissible and often regarded sufficient to establish the fact of adultery, nevertheless it must be so clear and strong as to carry conviction of the truth of the charge, and, if it does no more than raise a suspicion of unchastity, it should be treated as insufficient.   (p. 277).

Appeal from Circuit Court, Wood County.

Suit for divorce by Perry Nicely against Florence May Nicely, with cross-bill by defendant.   Decree for plaintiff, and defendant appeals.

*Reversed, decree for defendant, and remanded.*

*J. W. Vandervort* and *R. E. Bills,* for appellant.

*T. A. Brown* and *A. D. Ireland,* for appellee.

MILLER, JUDGE:

Upon a bill by husband against wife for divorce *a vinculo* upon the ground of adultery, and a cross bill answer by wife against husband denying the adultery charged and alleging adultery on his part and cruel and inhuman treatment and desertion by him, and praying for a decree of divorce *a vinculo* and for alimony and for general relief, the court below by the decree complained of, granted the plaintiff the relief prayed for, dissolved the bonds of matrimony, and

thereby also barred defendant of all dower and marital rights in plaintiff's property, and awarded him costs against her.

The questions presented upon this appeal are, first, whether the decree is justified by that clear, positive and satisfactory proof always required in such cases; and, second, if the decree be erroneous for lack of such evidence, whether defendant on either of the grounds alleged in her cross bill answer is entitled to a divorce *a vinculo* or *a mensa* from plaintiff, and to alimony or to any relief.

On the first issue presented we have examined the evidence with great care, and find ourselves unable to reach the same conclusion arrived at by the learned and painstaking judge of the circuit court.

Both parties had been previously married and had grown children, married, by their former spouses. They had been married only a little over a year when the bill was filed; the marriage took place on September 20, 1914, and the bill was filed at November Rules, 1915. They lived and cohabited together from the time of their marriage up until about the time of the institution of this suit, and while there is some evidence that he was not as dutiful to her in sickness, and at other times as he naturally should have been, and failed to provide her with clothing suited to her and his station in life, there is no charge or evidence of any trouble between them.

Some two or three weeks before the bringing of this suit plaintiff absented himself from his home, telling his wife that he was going on business to the state of Alabama. Whether he did in fact go to that state does not positively appear; defendant gave it as her belief that he did not go to Alabama, and though he was afterwards put upon the witness stand to testify briefly on his own behalf, he makes no mention of his absence, and gives no account of any trip to Alabama or elsewhere. The only charges of infidelity made against defendant are that on or about October 25, 1915, and at divers other times during that month she committed acts of adultery at plaintiff's residence with a man to plaintiff unknown; and nowhere else in pleadings or proof or other-

wise is there the slightest aspersion cast upon the previous and presumably good name and reputation of this woman.

But the record discloses that during the supposed absence of plaintiff in Alabama a married son of his, inspired thereto by some one, or acting on his own initiative, by whom or how he does not attempt to explain, for he was not put upon the witness stand, began to lay plans and employ agents to entrap defendant. Whether Boso, whose evidence is principally relied on by plaintiff, was one of those agents, is not very clearly disclosed by the evidence, but to say the least of it, it morally convinces us that he was, notwithstanding the court would not permit defendant to show the fact because she could not connect plaintiff with his employment. But the fact is that on the night of October 25, 1915, when young Nicely procured the arrest of defendant he took with him two lawyers, one of them the attorney employed to prosecute this suit, the other his law partner, who the evidence shows was employed to conduct the raid made on Mrs. Nicely's home, and also two constables also employed by him, and together they all went to the Nicely home after dark, and, by some arrangement or coincidence, they arrived there just as Boso arrived, and although those who testified say they could not recognize him in the dark, they say they did recognize the form of a man entering the premises of Mrs. Nicely, and that they at once returned to town, where Deem, the constable, accompanying them on this trip, procured a warrant for defendant and one John Doe, charging them with adultery, this without having recognized the man, whether it was defendant's husband, or a neighbor, or some one entering on legitimate business.

Having procured the warrant, they employed another constable, and paid both sums of money far beyond their legitimate fees as public officers, and returned to the Nicely home about eleven o'clock, where these constables for an hour or two patrolled the grounds about the house, in an endeavor to see or hear something that was transpiring on the inside of the house between the occupants. They say they saw nothing because the blinds at the windows were down, but they heard foot steps and some talking which they could not un-

derstand, and one of them says he heard sounds as if kissing was going on, the other says that he did in fact hear kissing. As the blinds were down, and the doors shut, it strikes us that it must have been a very remarkable osculatory performance, if it in fact took place, which is denied by Mrs. Nicely and not proven by Boso, the other party. Moreover, they say that as the lights were turned out, the door was opened, and as Boso was about to emerge, they made their ·entrance, one of them seizing Boso, who claims to have·been knocked down by him, the other taking charge of Mrs. Nicely. Boso was allowed to make his escape, though both constables were armed and prepared for the occasion. He was seen by·them going out the front door and was followed at least to the porch, and was seen by them at the gate. He was not even commanded to stop, and no attempt was ever afterwards·made by any one to procure his arrest, and finally he was made the star witness for plaintiff in this case. After arresting Mrs. Nicely and getting her promise to appear at the justice's office the next day, they released her and afterwards lawyers and constables met at the home of young Nicely, and from there they all went back to town in Nicely's automobile.

Respecting the witness Boso the evidence shows that almost immediately after plaintiff absented himself on the occasion in question, admittedly a perfect stranger, he made his appearance at the Nicely home representing himself·to be a photographer, and engaged in the business of enlarging pictures. On the first visit he found. her at work in the, garden. From there he followed her into the house where she arranged with him to enlarge a picture she had of her old home, and at another visit the picture of her daughter. He took the pictures, and thereafter made this business his excuse for a number of other visits and as she says to call her on the telephone and to arrange to come to see her about it and explain his failure to deliver the pictures. The last visit but one before the night of October 25, 1915, was on the evening of October 23rd, when Mrs. Nicely·and her niece, Miss Ingold, were engaged in decorating and putting the house in order for a wedding. On this occasion as Mrs.

Nicely and Miss Ingold both swear, Boso insinuated himself into the house without bringing the pictures, and when there and seeing the women at work, he suggested that they needed the assistance of a man to fix the mantels on the gas jets and to assist in the other work, and having proffered his services he was allowed thus to assist them, and they were engaged there until about twelve o'clock, at which time Boso, they say, had to be urged by them to go away. But before going, and at the suggestion of Miss Ingold that it would be a nice thing to have a picture of the table and the guests at the wedding, he promised to be at the wedding the following evening prepared to take the picture, but did not arrive until the wedding was over, and all but two or three of the guests had departed, when along about eleven o'clock, he appeared, knocked and was admitted by Miss Ingold into the sitting room, and invited by her into the parlor where Mrs. Nicely's daughter, Mrs. Soule, and the other guests were; he excused himself and after all were gone but him he remained until he had to be urged by Mrs. Nicely to go away.

This was his last appearance until the Monday night when the officers made the entry into the house already described. No attempt was made to show any improper relations between Boso and Mrs. Nicely until the night of October 25th. Nowhere does Boso say there were any such relations except that he pretends that Mrs. Nicely called him on the phone and invited him to come over in the absence of her husband which she flatly denies. That nothing improper occurred between them previously, Mrs. Nicely is corroborated in part at least by the evidence of her niece and daughter. Miss Ingold was with Mrs. Nicely on the night of October 23rd, and both were with her on the night of the wedding, and there is not a particle of evidence connecting her with any improper relations on those occasions. All swear there were none.

Boso showed himself a willing witness for plaintiff, and when examined lived in Pennsylvania, but made his appearance at Wheeling, West Virginia, where his deposition was taken on notice not disclosing his name, and though not controverting many of the material facts sworn to by defendant

and her witnesses, nevertheless admits his presence at the Nicely home on the several occasions mentioned, and though apparently willing to cast suspicion on Mrs. Nicely as far as necessary to convict her, when the straight categorical question was propounded to him whether he had had sexual intercourse with her at any time, contented himself with a declination to answer.

The evidence of Mrs. Nicely impresses us with its apparent fairness. She makes no effort to conceal the facts, but apparently makes a clear frank statement of all that occurred. She admits that she was found in an embarrassing situation with Boso on the night of October 25th; but says it was not of her choosing, but circumstances created to entrap her and imposed upon her by some one to create a false impression and on which to base false accusations against her. She flatly denies adultery with Boso, and outside of these circumstances, and the evidence of her alleged confession before the justice the following day, which she denies making, there is not a particle of evidence to support the charge of adultery. She explains how on the night of October 25th she urged Boso to leave the house, and how improper she thought it was for him to be there, and how he persisted in staying, particularly after they heard noises about the house, for the avowed purpose of protecting her.

If Mrs. Nicely is to be believed, and there was in fact a conspiracy to destroy her reputation, and Boso was the hired agent of Nicely or his son to do so, this self accuser of wrong doing, a married man, could not have been better chosen, nor the scheme better or more timely planned and carried out. That Boso was a party to a scheme to destroy Mrs. Nicely we think there can be no doubt, though the court would not admit direct evidence thereof because defendant was unable to connect plaintiff directly with such a scheme. That there was such a plan instituted by Nicely's son we have no doubt. The evidence plainly shows it. That Boso had previously visited the office of the attorney employed by young Nicely, and the law partner of the attorney for the plaintiff in this case, and before the night of October 25th, is substantially admitted by the latter when put upon the

witness stand by defendant. His own words are "I think Charlie Boso has been in the office, although I would not be positive about that, because prior to this summer I scarcely knew the man by sight and had no personal acquaintance with him."

With respect to this important fact, as already indicated, defendant proposed, but was not permitted to prove, by two witnesses, that Boso was employed by the attorney acting for young Nicely or his father, to entrap Mrs. Nicely, and was paid a large sum of money for doing so. The court below justified its rulings on the ground that defendant was not able by direct testimony to connect plaintiff with the transaction. In this we think the court was in error. As plaintiff, to establish the fact of adultery, relied on circumstantial evidence, created or induced by young Nicely, and by Boso and others, all the facts and circumstances were proper to go in evidence on the question of defendant's guilt or innocence, and as bearing on the credibility of the active agents in bringing them about. If Boso was in fact so employed whether by young Nicely or his father, the fact of such employment would certainly have an important bearing on the value of his evidence, if not upon the question of her guilt. It is conceded by plaintiff's counsel that if he had in fact procured defendant to commit adultery with Boso he would be thereby barred of all right to relief against her, for he could not profit by his own wrong. And we think it equally true that if some one else laid and executed the plan, he could not exclude the evidence thereof, when relying on such manufactured evidence to make out his side of the controversy. The facts connected therewith ought to go in as tending at least to impeach the evidence of the perpetrators of the wrong. We think these propositions are supported by 2 Wigmore on Evidence, sec. 961 and cases cited; *Graecen* v. *Graecen*, 2 N. J. Eq. (1 Green Ch.) 459, 461; *Throckmorton* v. *Throckmorton*, 86 Va. 768, 11 S. E. 289. As the Chancellor in the New Jersey case, a divorce case, says: "I would not give much credence to the story if it depended on the testimony of this witness alone, for I could desire no stronger impeachment of his character than the fact that he would suffer

himself to be employed in so despicable and dishonorable a transaction.''

We do not controvert the proposition that the fact of adultery is often very hard to establish, and that it may be inferred from facts and circumstances, but when such facts and circumstances are shown to have been the result of fraud and corruption to destroy character, the evidence thereof is competent to go in to explain the same and to impeach the inculpating witness.

Respecting the warrant charging defendant with adultery, she says she did not read it, and did not know what she was charged with, and though she went to the justice's office as promised she did not confess guilt, but did just what she was directed by Boso to do, who appeared the next morning at her house and gave her $20.00, he says $25.00. She says his directions were: ''I do not think the fine will be any more than that; you will have to pay this, and when you get over there, don't talk to those people or say anything to them for you know the least said is the easiest mended; you just say to them, how much is it, and they will tell you, and you pay it and ask no questions.'' She seemed to understand that she was accused, not of adultery, but of some other offense, and when she returned home and looked at the receipt which was folded up and given her by the justice, and found it referred to the charge of adultery, she at once called him up and repudiated the charge, and demanded that it be corrected, and when he refused to do so she applied for an appeal, which was also denied; and a mandamus proceeding against the justice pending here upon a writ of error to the judgment of the circuit court refusing the writ was heard and argued on the same day this case was heard, and in which the judgment of the lower court is to be reversed and petitioner awarded the relief sought thereby. As that case will go back to the circuit court and the case before the justice be tried *de novo* on appeal in the circuit court, we of course express no opinion on the question of the actual guilt or innocence of the accused, as it may be shown at that trial. We are dealing only with the case presented here, and which

must be disposed of as the record presents it, and according to rules and principles governing us in such cases.

We decided in two recent cases, reversing the lower court in each case, the main facts and circumstances in which were not unlike those relied on here, that though circumstantial evidence is admissible and sufficient to prove adultery, in a suit for divorce, it must be so clear and strong as to carry conviction of the truth of the charge, and, if it does no more than raise a suspicion of unchastity, it is insufficient. *Huff* v. *Huff*, 73 W. Va. 330; *Anderson* v. *Anderson*, 78 W. Va. 118, 88 S. E. 653. It is our opinion that the evidence in this case does not measure up to the requisite standard to establish the fact of guilt, and that the decree below ought to be reversed and relief denied, even in the absence of the evidence which we think the circuit court improperly rejected.

On the other hand on the cross bill answer of the defendant, we are of opinion that she is entitled to a divorce *a mensa,* but not *a vinculo.* It is alleged and shown that plaintiff falsely accused her of adultery, which is cruel and inhuman treatment, one of the grounds charged and relied on by her; and that he deserted her he admits, and we have decided, without justifiable cause. She is therefore entitled to a divorce on the ground of cruel and inhuman treatment, if not for desertion, and should be restored to her marital rights and have a proper amount of alimony decreed to her against the plaintiff. *Reynolds* v. *Reynolds,* 68 W. Va. 15. A decree will, therefore, be entered here denying the relief prayed for, and granting defendant a divorce *a mensa,* and remanding the cause to the circuit court that a proper decree for alimony may be there entered in favor of the defendant against plaintiff, and to be further proceeded with in accordance with the rules and principles governing courts of equity.

*Reversed, decree for defendant, and remanded.*