# Wytheville.

## NORMAN H. JOHNSON v. ALICE B. JOHNSON.

June 12, 1930.

Absent, Campbell and Epes, JJ.

The opinion states the case.

*L. O. Wendenburg*, for the appellant.

*Smith & Gordon*, for the appellee.

*Holt, J.*, delivered the opinion of the court.

In this cause, in the court below, the plaintiff, Alice B. Johnson, was granted an absolute divorce, and from that decree an appeal has been allowed.

Both litigants came originally from North Carolina, the husband from Raleigh and the wife from Charlotte, and were married in Blackburn, S. C., on June 8, 1907, after a brief courtship.

They went first to Raleigh to live and remained there until early in 1908, when they moved to Charlotte, and to the home of Mrs. Johnson's parents. There, on March 26, 1908, their first child, Norman, was born, and there also, on August 21, 1909, was born their second child, Martha. In October of that year they came to Lynchburg, Va., where they continued to reside until, April 1913, when they moved to Richmond, established their home at 824 W. Grace street, and lived there until August, 1915, when they went to 10 N. Boulevard, where they lived until their separation and where Mr. Johnson still lives.

In the spring of 1925, Mrs. Johnson left her home and went to live with her sister, Mrs. Frank Davis, but a reconciliation was soon after effected, and she returned to her husband. Early in 1926 she went abroad with some friends and returned in the latter part of April. On May 18th she again left her home and went to her brother-in-law, Mr. Davis, who lives at 1700 Hanover Avenue. This last separation has continued, and

on August 27, 1926, she filed her original bill in this cause which charges cruelty and adultery, and on December 30, 1927, she filed an amended and supplemental bill in which a specific act of adultery is set up. All of these charges the defendant has by answer denied, but he has filed no cross-bill.

On August 17, 1928, a final decree was entered which sustained the charges in the amended and supplemental bill and granted to the complainant an absolute divorce.

The record is unconscionable in size, and wanders in many by-roads, most of which lead to nowhere.

Does the evidence sustain the claim in the supplemental bill? We think not. How must we measure it when such an offense is charged?

Judge Lewis, in *Throckmorton* v. *Throckmorton*, 86 Va. 768, 11 S. E. 289, 290, gives us a fine yardstick. "It must be such * * * as to lead the guarded discretion of a reasonable and just man to the conclusion of the defendant's guilt." From its very nature, it must often be circumstantial, and circumstantial evidence in such cases is governed by the ordinary rules which obtain when it is elsewhere under consideration. Common sense and the common experience of men are our best guides.

We come first to the incident of December 3, 1927. On the evening of that day Mrs. M. K. Marsh, who had known Mr. Johnson for twenty-five years, called him over the 'phone to say that she wished to consult him on a matter of business. Thereupon an appointment was made, she came to his home and remained until around eleven o'clock, longer it is true than was apparently necessary. Mr. Johnson then told her that he had an engagement, and offered to take her home. She got into his car and they then first drove around

to the Belmont Apartments where he expected to meet, and did meet, some friends, Mr. M. W. Stockton and wife, and also Mr. Chas. A. Clark and wife. Mr. Stockton Mr. Johnson knew, but he had never met Mr. Clark.

Just what had gone before relative to this trip to the country is not plain, but then a plan was made to go down to a bungalow, in King William county, owned by Johnson or Stockton, or both of them, on an outing, and it was at that time that Mr. Stockton invited Mrs. Marsh to go along. This invitation she accepted, and Mr. Johnson then took her by her home to get some heavier clothes, the understanding being that she and he were to go on to the bungalow in his car, and Mr. and Mrs. Stockton and Mr. and Mrs. Clark were to follow in the Stockton car as soon as certain impedimenta could be gotten together. In pursuance of this plan, Mr. Johnson and Mrs. Marsh did go to the bungalow, but the other party and car, taking stock of the weather, abandoned the trip.

The night was a bitter one, filled with rain, sleet, snow and ice, but it was bad when the agreement to go was made, and so its abandonment could not have been foreseen. Johnson was in fact followed by a car carrying Mrs. Johnson, the son, Mr. Davis and a detective, and so he may have thought they were his friends who were following; if so, he was mistaken. A short time after reaching his journey's end, the detective came up claiming to be lost. Mr. Johnson asked him to help him with the door lock, then clogged with ice. He did help, was asked in, and offered food and drink, which hospitalities were refused. He and his party then returned to Richmond, and the next day, Sunday, Mrs. Johnson swore out a warrant against her husband charging that he was in consort with a woman

other than his wife. This warrant was served by the sheriff about 12 M. Sunday.

For Johnson's conduct after reaching the bungalow there are several adequate and not inconsistent explanations. It is said that he might have gone to Kelly's, who lived near there; but it was a bad hour on a winter's night to call up casual acquaintances, or in fact to call up anybody; moreover, they were expecting the other car to put in an appearance at any time. Their own car could not be started and they could not return to Richmond or go anywhere else in it, and it was no night for a woman to be walking across the country. Mr. Kelly did come over Sunday morning to see what could be done to help, and there was a negro boy also about the place. That the car would not work is made plain by the fact that mechanics tinkered with it till late Sunday afternoon before it could be made to go.

Mr. Johnson did undress; he was in a dressing gown when the sheriff came, but he had gotten wet, and he did say that Mrs. Marsh was his sister, and then a friend of his sister, and for this there was no excuse; probably he thought he was protecting her, and the sheriff did testify at the magistrate's trial that he said his friends did not expect to come on down, but this is in conflict with the evidence both of Mr. Stockton and of Mr. Clark, witnesses who, so far as the record shows, have no interest in this case.

Moreover, if this were true, what was the occasion for them to go to the bungalow at all? If they were impelled by any improper purpose, the natural thing for them to have done would have been to return to the Johnson home. Mr. Johnson was living there by himself. That we should avoid the appearance of evil is of course true, but on occasion the very elect, in the language of the defendant, sometimes get in a "jam."

The evidential value of a situation, standing alone, in some circumstances, is less important than are the reasons which brought it to pass.

Those cast by shipwreck upon an atoll might pass unscathed, while others who spent an outing on a South Sea island might set the tongues of gossip wagging. These people were placed in an embarrassing situation, but their account of how it came about carries in it no challenge of credulity, and so cases like *Ford* v. *Engleman*, 118 Va. 89, 86 S. E. 852, do not apply.

Upon trial of the King William warrant before magistrates, Johnson was found guilty, but on appeal a jury held him to be not guilty, and we think their verdict was sustained by the evidence.

■ All that has been said refers to the amended bill, and the decree appealed from rests upon it. The able and painstaking chancellor who heard the case did not deem it necessary to pass upon the issues raised by the original bill at all, as it manifestly was not in the view he took of the case, but it is said that since he might have passed upon them, they are now *res adjudicata* (*Diamond State Iron Co.* v. *Rarig & Co.*, 93 Va. 595, 25 S. E. 894); that the situation is as it would have been had the chancellor held with the defendant on the original bill.

If we assume that what was done amounts to a finding that the charges in the original bill are not sustained, it is plain that as to it error may be assigned, and therefore, so far as this cause is affected, it makes no difference whether we treat it as a matter not passed upon at all, or as decided adversely to the plaintiff. In either event there could be an appeal, which would bring up the whole record for review.

■ This brings us to the charge of cruelty.

Evidence taken and incidents relied upon go from

honeymoon to separation. A detailed discussion of them would lengthen this opinion beyond the limits of patience, and serve no public purpose. Outbursts of temper, the use of profane and insulting words, threats with butcher knife and razors, and the actual use of physical violence are all charged and "rise like a lamentation and an ancient tale of wrong." That Mr. Johnson has an ill-controlled temper and is given to the use of intemperate language is perfectly plain from the record, but beyond this we must proceed with caution, particularly in the examination of statements made by the wife, son and daughter. The attitude of the son may be measured by the fact that he assaulted his father in a hospital where he had gone to recover from a nervous breakdown following final separation; the daughter confined herself to expressing an amiable desire to stick scissors in his throat; while the wife, with a detective, in bitter weather and in sleet, followed her husband at night many miles across the country hunting for evidence.

That this husband has steadfastly loved his wife cannot be questioned; his conduct and his letters show it. It is admitted that he was generous to her financially. He gave her an adequate allowance, and said that he did not wish her to account for it. He regularly gave her substantial Christmas gifts; he gave her automobiles; he gave her what in Virginia must be regarded as exceedingly handsome jewelry; he sent her to the springs, to Virginia Beach, to Atlantic City, to New York, to Canada, and, as late as 1926, to Europe. The excursion ticket for this trip cost about $1,000.00 and he gave her $2,500.00 to cover additional expenses, and took out for her while she was gone a life insurance policy of $5,000.00. That men may do all this and at the same time beat their wives is possible, but not probable.

He had cause at times to be irritated. That she was untrue to him in any narrow sense is not true, and is not claimed; but in a larger way she was surely not loyal. Among her friends was an ante-nuptial admirer, with whom she carried on a correspondence during 1913, 1914 and 1915. The letters are not all dated, and so the period of its duration cannot be fixed with exactness. Some of those from this admirer are in the record, and are amazing productions. In their warmth they would have done high credit to Abelard himself. He tells her that she is his compass, and the custodian of every high aspiration, and that without her he is a "derelict on life's high seas."

Mrs. Johnson at that time seriously contemplated divorcing her husband and marrying this admirer. This she says was done in a "moment" of weakness, but this correspondence certainly continued for as much as a year and a half, and so this "moment" was long drawn out. She describes herself as "a lost soul looking for sympathy," and thus sums her attitude towards this incident: "I really am not ashamed of it." She pondered in her mind whether it would be better "to give the children another father," or to keep the one they had, and finally concluded that it was better to suffer the ills she had.

When the facts became known, Mr. Johnson behaved with dignity and restraint manifestly controlled by his love for his wife.

Other incidents not so striking as this might be mentioned. Mrs. Johnson was fond of admiration, and had admirers, as have other attractive women; one of them from Canada knew her well enough to call her by her given name, and came to Richmond, certainly measureably because she lived there. Marital relations seemed never to have been perfectly normal and easy.

She returned from the european trip on April 25, 1926, and tor a few days "everything went on beauti-fully." On May 3rd he went to New York on business and returned on May 8th. One squabble followed another, and the witnesses are so biased th&t it is difficult to know what to believe. Mrs. Johnson sums up her attitude in these words: "I ignored him; I certainly was not unpleasant."

Conditions culminated, as we have seen, on May 18th, when she made a somewhat dramatic exit from her home, clad in slippers, a *robe de nuit* and a cloak, leaving behind her a closet full of clothes.

The use of intemperate language has been shown. Has physical violence been proven also? It is denied, and it is significant that no marks of this violence seem to have remained. When we remember this husband's unquestioned love and generosity, as against the deep bias of witnesses relied upon to prove it, we reach the conclusion that it has not been established.

Back of all their trouble is this: Mrs. Johnson never really loved her husband. This he must have sensed and resented, maybe subconsciously. Here was fertile soil, and the results are not surprising.

What is cruelty within the purview of the statute?

In *Latham* v. *Latham*, 30 Gratt. (71 Va.) 307, Judge Staples said: "According to the authorities, the cruelty that authorizes a divorce is anything that tends to bodily harm and thus renders cohabitation unsafe; or, as expressed in the older decisions, that involves danger of life, limb or health. I agree there may be cases in which the husband, without violence, actual or threatened, may render the marriage state impossible to be endured. There may be angry words, coarse and abusive language, humiliating insults, and annoyances in all the forms that malice can suggest,

which may as effectually endanger life or health as personal violence, and which, therefore, would afford grounds for relief by the court. But it is obvious that what merely wounds the feelings without being accompanied by bodily injury or actual menace—mere austerity of temper, petulance of manner, rudeness of language, want of civil attention and accommodation, or even occasional sallies of passion that do not threaten harm, although they be high offenses against morality in the married state—does not amount to legal cruelty." *Ringgold* v. *Ringgold*, 128 Va. 485, 104 S. E. 836, 12 A. L. R. 1383; *Butler* v. *Butler*, 145 Va. 85, 133 S. E. 756.

▮ The fact that language used is profane, coarse and mortifying may not in itself be sufficient. Such manifestations of want of self-control are deeply to be deplored, but there must in addition be fair reason to apprehend injury to health, physical or mental, and it must not be invited. Here it was the husband and not the wife who suffered a nervous breakdown, and had to go to a sanitarium for treatment. The evidence dealing with this phase of this case points to this conclusion: Mr. Johnson said what he pleased, and Mrs. Johnson did as she pleased.

Cruelty has not been established.

▮ The original bill contains, *inter alia*, these charges: "Complainant avers that during her absence on said trip, to-wit, in the month of February or March, 1926, the exact dates being to complainant unknown, her said husband committed adultery in their said house with one (who is named), and with other women whose names are to complainant unknown."

To support them, evidence dealing with the general demeanor of the defendant, and particularly with his conduct on three separate occasions, is relied upon.

During the time that Mrs. Johnson was in Europe, and after the final separation, considerable entertainment went on in the home, both of men and women, and at times there appears to have been unwise indulgence in intoxicants. Mr. Johnson was not always circumspect in his conduct toward some of his guests, and certainly on one occasion indulged in liberties that might have been omitted—liberties not wrong in themselves, but which serve to indicate a breaking down of those conventions regarded as important under a more punctilious social regime.

Taking up the specific instances more in detail, we find these statements in Mr. Davis' evidence:

"Q. Last February or March, while Mrs. Johnson was away on her European trip, did you have occasion at any time to go to Mr. Johnson's house at No. 10 N. Boulevard to see whether he was there?

"A. Yes, I went there.

"Q. Explain now just the occasion of your going there?

"A. Something came up in the office pertaining to the Southern Wholesale Dry Goods Association. The young lady asked me what to do about it and I told her I didn't know anything about it and didn't have anything to do with it. I suggested to her that she try and get in touch with Mr. Johnson, and just at that time I went out of the office. She called up the house anyway, or I gather she did, and in about thirty minutes when I got back to the office she said she had gotten Mr. Johnson, and she said he was sick, and the doctor said that he had better stay in bed a day or two, and so I went up there just before dinner.

"Q. When you speak of dinner, what do you mean, the evening meal?

"A. I mean the evening meal. I went up there

and didn't see any lights, and I rang the bell and didn't get any response, and I walked around the back of the house and knocked, and still didn't get any response, and then I called him from the back way, and I could see a little light in the bedroom, and then I called once or twice and still didn't hear anything, and came back around the front and rang the bell, and he came to the door dressed in his pajamas and bathrobe and slippers. I didn't turn on the lights, but it was about dark, there was some light from the street. I said: 'Norman, how are you feeling?' and he said: 'I am feeling pretty badly.' I said: 'I came up to see if I could do anything for you,' and he said: 'No.' I told him: 'You had better snap out of this thing or it will get you,' and he said the doctor said he must stay in bed a day or two. I said: 'Is there anybody here with you?' and he hesitated a moment and then said: 'Yes,' and I said: 'Do I know her?' and he said: 'No.' I said: 'Norman, you had better snap out of this and if there is anything I can do for you let me know,' and I left."

This is Mr. Johnson's account of what then occurred: He said that he had been sick, and that "I sent the maid to get some graham crackers and milk, and I had been reading the News Leader upstairs, the shades were partially down because we got the afternoon sun, so I had the lamp lit or rather light on. Davis came and entered the door as I was going up the steps. I had my hands on the banisters. He said: 'Norman, how are you feeling?' I said: 'Frank, I am feeling better, but I will be all right tomorrow morning.' He looked upstairs. 'What is that light doing up there? Have you got any women up there?' I said: 'Yes, I have got a harem up there. Go up and meet them,' and he laughed and walked about four steps up the stairs and he went out and says: 'Is there anything I

can bring you?' and I said: 'No,' and he says: 'Well, I hope you will be all right tomorrow,' and with that he walked out."

Mr. Davis, on cross-examination, answering the suggestion that all of this was a joke, reiterated his original account as to what then occurred.

The next accusation deals with the presence of a certain woman whom we shall designate as Mrs. X at this home in March, 1926. Mrs. Davis testified:

"Q. While your sister was away in Europe did you at that time see Mr. Johnson at his own home with any other woman, and if so, will you state just what the circumstances were?

"A. On one occasion, I went into the house, one night between eight-thirty and nine o'clock, and found him sitting on the floor with one very small light in the back hall.

"Q. Did you know who this woman was,

"A. No, I don't think I did. Her back wasn't familiar.

"Q. Did she show her face?

"A. Never.

"Q. Were both of them sitting on the floor?

"A. Yes, both very close together.

"Q. Whereabouts were they sitting?

"A. They were sitting in the back hall by a table beyond the radio.

"Q. About when was this?

"A. That was in March sometime, March, 1926.

"Q. What was Mr. Johnson's attitude when you found him there in that position with this woman?

"A. Naturally at first he was surprised and he got up. He didn't introduce me to the girl. I stood there I don't know how long, but it seemed ages, and he got up and I told him to come to my car, and as we were

going out he said: 'Mary, I am sorry,' and after we got to the car he said: 'Mary, you and Alice know that girl,' and I said: 'Norman, I don't know her,' and I told him he should be ashamed of himself, then I drove off. I had brought some clothes, and he took the clothes out. When I reached home he telephoned me and asked me to come up there, and I said: 'Norman, I am not coming up there,' and he said this girl was a certain party, mentioning her name, and that her husband was back in the back of the house drunk, and I told him that I knew it wasn't this party, and then he said it was somebody, a girl from South Boston, and I told him: 'No, it couldn't be them because I mentioned the people, and then he came down to my house later, and he said he had gotten rid of these people at last and said: "I really don't know who they were."'"

"Q. Was anybody there besides Mr. Johnson and this girl?

"A. If there was I didn't see them. They were not in the part of the house I was in, and I didn't see or hear them.

"Q. And you say there was only one light?

"A. One dim light in the back of the hall, just by the back hall door, and near the entrance of the basement.

"Q. On the evening when you found Mr. Johnson and the woman seated on the floor in the hall of his house as you describe, had there been any arrangement or engagement on his part about coming to your house?

"A. Yes, he reached town that day, and some friends of mine called me and asked me if they could come up for a game of bridge, and I said: 'Yes, if I can get Norman to come down,' and I called him at the office and he said: 'I am very sorry, but I am going to work to-night.' That was the reason I was very much

surprised to find him there. He had told me he was going to be at the office, that he had been away, and wanted to work.

"Q. Have you any idea who this woman was that he was on the floor with?

"A. No, I don't think I have ever seen her, and I have never been introduced to her.

"Q. But I understand you to say that he did make three explanations to you in regard to who she was?

"A. He made three explanations to me.

"Q. Were they three explanations or three different explanations?

"A. They were three different explanations."

Mr. Johnson testified that on this evening he was expecting Mrs. Davis, and was on his porch looking for her, when a lady passed down the street and spoke to him. Answering he asked her if she was not Miss. ——. She replied that she had been Miss ——, but was now Mrs. X. This was before sunset. He had not seen her since the war, or for eight or nine years, and had only seen her then once or twice at some meetings for the sale of Liberty Bonds, in fact, he did not recall having formally met her at all, and knew her so slightly that he afterwards had to ask the Anthonys just what her married name was. His testimony dealing with this incident is, in part, as follows:

"Q. Mrs. Mary Davis has testified that one night in March, 1926, that you and some woman were sitting on the floor with a small light in the back hall. What about this?

"A. In the first place there is no small light in the hall. It is a regulation light, was built in the house, and carries the usual size bulb, in fact, I put a little larger bulb than Mrs. Johnson keeps in there for the

reason that it is immediately over my sound box of the radio. The radio is the length of this table from the sound box. This is a very powerful sound box, and must be kept considerable distance away from the receiving set, that light was lit, it was not in the back hall because we have no back hall, but there is a sort of little butler's pantry between the kitchen and the hall of my house. Mrs. X and myself were at the radio, which sets in the front part of the house in the front hall, and we were there in that position. I was sitting down on a rug, my rugs had not been taken from the house or burglarized from the house at that time by Mrs. Johnson. The table which the receiver is on, I doubt if it is thirty-one inches high, and in changing from station to station, I generally go there and drop down on one knee and change. If I am playing New York I have got to get another location with the disc, Chicago, Alabama, or whatever station I want to get. I was demonstrating to this young lady how the least change of the dials would bring in a different city and a different program. Mrs. Davis, as a matter of fact, I was waiting for Mrs. Davis to come, the maid had told me that she was to bring Martha's c othes. * * * A few minutes before Mrs. Davis arrived I was out on the porch looking up the street to see her come. The radio was playing. I did not know this woman as Mrs. X. I knew her by her maiden name, or rather I thought I recalled her as a maiden, the name escapes me for the time being; anyway she spoke to me, and I asked her if she wasn't Miss so and so, and she told me she had been married, and she asked me if that wasn't a Victrola, and I said: 'No, that is a radio;' and she told me that she had never heard a radio, and I told her to come in and I would show her the finest one in Richmond, perhaps the best one in the South.

It wasn't dark, and the only reason I had the light on at all was because I had some trouble with the plug that was on the loud speaker which is immediately under the lamp that is spoken about."

Mrs. X's account of what occurred is substantially that given by Mr. Johnson.

We come next to a night which Mrs. X spent in the Johnson home. On the occasion last mentioned, Mrs. X left soon after Mrs. Davis happened in upon them. Mr. Johnson asked her where she was going, and was told to the Anthonys. It then developed that he had known Mr. Anthony as a boy, and played baseball with him. He expressed a desire to renew this acquaintanceship, and so, in answer to this wish so expressed, Mrs. X called him up at his office one night about a week later, after eleven o'clock, and made an engagement with him to come by her home, meet her at her door, and take her over to the Anthonys. This was done, and by way of entertainment, a phonograph was there turned on. It was an indifferent instrument, and Mr. Johnson asked them to go around to his house and hear some real music over the radio; an opera was then being broadcast from Chicago. This they did, and that entertainment lasted until one o'clock. Thereupon they all started back to the Anthonys, but the Johnson car starter would not work. It began to rain, and at his suggestion they went back into the house and retired within a reasonable time. He left home next morning and did not see his guests again until he returned from his office to his home, where they still were, and where they remained to dinner. Something was drunk, but not much. This is the substance of his statement as to what happened at that time.

Mr. and Mrs. Anthony give a different reason for

spending the night in the Johnson home. They were too drunk to leave, and after they went to bed could give no account of what became of Mr. Johnson and Mrs. X.

Mr. Johnson gave Maj. Baird, father of Mrs. Johnson, another account of this meeting. He said he was driving down the street one day when some one hailed him. It turned out to be his old baseball acquaintance, Anthony, with his wife and Mrs. X. They, at his invitation, got into his car; he drove them to his home where they had a cocktail, when he took them to the Anthony home; and that the Anthonys stood socially so high in Richmond that they were ample warrant for his accepting Mrs. X; and with some not very material variations this is what he told his wife. At that time Mr. X was a masseur and worked at a sanatorium, and Mr. Anthony was a hostler and worked for the R. F. & P. Ry.

On the first occasion, when Mr. Johnson claimed to be sick, he was innocent, if we accept his statement. The inference of guilt follows if we accept Mr. Davis' testimony.

So also on the second, his statement, if accepted, again shows him to be blameless. If we are to believe Mrs. Davis, a different conclusion is almost inevitable.

Much of the evidence which deals with this second incident must be scrutinized with care. Mrs. X had not seen Mr. Johnson for nine years, and indeed had never really known him, and yet we find her going into his home on this casual meeting to enjoy music, and to examine what to her was a new and curious instrument, a radio. There were not many other wide awake young women living in Richmond at that time who had never seen a radio. At the end of this unconventional visit, we find these two people making an

engagement to visit another casual acquaintance not seen for a generation.

All of these things are possible, but probabilities rather than possibilities usually control in the consideration of evidence.

It is not until we come to occasion number three that we reach something tangible. There Mr. Johnson took the Anthonys and Mrs. X to his house after twelve o'clock at night. They all spent the night there, because, as he has stated, of a sudden rain and because his car would not start. The Anthonys were his friends; they are not interested, and yet they say that their reason for staying was that they had drunk too much to leave; while Johnson's statement to Maj. Baird was that they did not stay with him at all.

It thus appears that some of the explanations of these suspicious occurrences are not reasonable, and some of them are disproven by disinterested witnesses.

It is perfectly true that circumstances are to be dealt with cautiously, and must be sufficient to control the guarded judgment of a just man, but more than this is not required. As was said in *Ford* v. *Engleman, supra,* credulity must not be stretched to the breaking point.

No one of these incidents, standing alone, should support a judgment, and had Mr. Johnson's standards of conduct measured up to those expected of Caesar's wife, maybe all of them would not suffice; but he was not living with circumspection, and must be judged accordingly.

We think the evidence sufficient to sustain a decree of divorce from the bonds of matrimony, and so that appealed from will be affirmed.

*Affirmed.*