## Richmond.

THROCKMORTON v. THROCKMORTON.

April 10th, 1890.

1. DIVORCES—*Adultery—Proof—Case at bar.*—When adultery is charged as the ground of divorce, the proof thereof should be " such as to lead the guarded discretion of a reasonable and just man to the conclusion of the defendant's guilt," though ocular evidence is seldom effected. A married man going into a known brothel, especially if when there, he shuts himself up in a room with a strumpet, is, unexplained, sufficient proof of adultery. In the case here, *held*, the proof is not sufficient to sustain such charge, nor that of cruelty or desertion.

2. CHANCERY PRACTICE—*Bill Amended — Effect of answer.*—Where original bill does not waive respondent's answer, and his answer under oath is filed, plaintiff cannot deprive respondent of benefit of his sworn answer by filing an amended bill waiving such oath.

Appeal from decree of circuit court of Loudoun county rendered February 14, 1889, in suit instituted by the appellant, Ann E. Throckmorton, for a divorce *a vinculo matrimonii*, from her husband, Mason Throckmorton. Opinion states the case.

*C. H. & R. E. Lee* and *W. E. Garnett*, for the appellant.

*E. Nicholls*, *J. H. Alexander* and *Foster & Nelson*, for the appellee.

LEWIS, P., delivered the opinion of the court.

This was a suit in the circuit court of Loudoun county by the appellant against her husband, Mason Throckmorton, for

a divorce *a vinculo matrimonii.* The grounds upon which relief
is prayed for in the bill, are desertion, *cruelty,* and adultery.
The charge of adultery is in general terms, the bill simply
alleging that the defendant "had frequently violated his mar-
riage vows and been guilty of adultery," without any allega-
tion as to time, place, or other circumstances. The bill also
prays in general terms that the defendant be required to
answer it, which he did on oath, denying that he had been
guilty of adultery with any person or persons within five
years next before the institution of the suit. The suit was
commenced on the 14th of October, 1887.

Subsequently an amended bill was filed, in which the
charges contained in the original bill are reiterated, the charge
of adultery being stated with more precision as follows:
"That the defendant on or about July —, 1884, visited a house
of ill-fame in Washington city, near the depot of the Balti-
more & Potomac railroad, on Sixth street, and then and there
violated his marriage vow by illicit intercourse with some of
the inmates of the house, and again, on the —— day of ———,
visited a certain other house of ill-fame in the said city within
the past three or four years, and also had illicit intercourse
with a woman in said last-named house, none of the names of
said women being known to your oratrix." The amended bill
also charges that the defendant "had illicit intercourse with a
woman named Martha C. Osborn, on or about the —— day of
———, 1884, and at divers other times in the same year, at
Snickersville, in Loudoun county, Va., and at other times
and places."

An answer under oath is expressly waived in the amended
bill, and the defendant answered it, but not under oath, deny-
ing the charges it contained as grounds of divorce.

Inasmuch, however, as there is no waiver of an answer
under oath in the original bill, the defendant is entitled to the
benefit of his answer, as in other cases. As was said in
*Latham* v. *Latham,* 30 Gratt., 307, it is the law of the forum,

and cases of divorce, so far from justifying a relaxation of the rule, would seem to call for its special observance, especially where not to observe it would fix upon the defendant the imputation of perjury, in addition to the crime of adultery.

Our statute (Code, sec. 3281,) permitting a complainant in equity to waive in the bill an answer under oath, is taken from the amendment to the forty-first rule of practice for the Federal courts of equity, and in *Conley* v. *Nailor*, 118 U. S., 127, it was decided, construing that amendment, that when the bill neither demands nor expressly waives an answer under oath, and the defendant answers under oath, the answer, responsive to the bill, is evidence in his behalf, conclusive if not contradicted. If a plaintiff in equity, it was said, is unwilling that the answer shall be evidence against him, he must expressly waive the oath of the defendant in his bill.

. It is unnecessary, therefore, to enter into any discussion to show that the defendant in the present case is entitled to the benefit of his answer throughout. The material charges in the original and amended bills are the same, the only difference being that in the amended bill they are set forth with more fulness and precision; and it can hardly be seriously contended that a complainant in equity may deprive the defendant of the benefit of his answer to the bill in which an answer under oath is not waived simply by filing an amended bill after the answer is filed, stating the same case in different language, and waiving an answer under oath. If the original bill was defective in not being sufficiently specific, it is not for the plaintiff to raise the objection. The objection could only have been made by the defendant, and he waived it by answering the bill without making it. 2 Bish. Mar. & Div. (5th ed.), sec. 606; *Holston* v. *Holston*, 23 Ala., 777.

Giving the defendant, then, the benefit of his answer under oath, as we must, the charge of adultery is not sustained. The only witness who testifies as to the alleged adultery in Washington is Wm. B. Chamblin, who says that on two occasions,

about three years before the institution of the suit, he, in company with the defendant, visited houses of ill-fame in that city, and that on one of these occasions, at least, the defendant "went up-stairs" with a female inmate of the house. The witness at the time was a resident of Washington, and had previously lived in Loudoun. His evidence, however, is not only contradicted by the answer of the defendant, but his credit as a witness is impeached. A number of witnesses were examined for the defendant, who testify that the general reputation of the witness for truth and veracity is not good, and several of them say that from their knowledge of his general reputation they would not believe him on oath. He is shown, moreover, to have been actively engaged in getting up evidence for the plaintiff; in his efforts to do so going to houses of ill-fame in Washington with a photograph of the defendant in search of evidence to sustain the bill. But the search was in vain. To one of the witnesses he said he was working up the case at the expense of the plaintiff, and that he had been authorized to say to a certain person, whose testimony was desired, that if he would go to Leesburg and testify in the case he need not want for anything in the future, or words to that effect.

It is not disputed that the fact of a married man's going into a known brothel, especially if when there he shuts himself up in a room with a strumpet, is, unexplained, sufficient proof of adultery. But, for the reasons just mentioned, the fact is not established in the present case. *Latham* v. *Latham, supra ;* 2 Greenl. Ev., sec. 44. And here it may be remarked that in any case where one man accompanies another to a house of ill-fame, especially if the visit be made at the suggestion of the former, and he afterwards turns up as an active witness in support of an application for a divorce, based upon such visit, his testimony ought to be received with caution.

Commenting upon the practice of employing private detectives in such cases, it was well said by Sir Cresswell Cresswell,

in *Sopnith* v. *Sopnith*, 4 Swab. & T., 243, that when a man sets up as a hired detective of supposed delinquencies, when the amount of his pay depends on the extent of his employment, and the extent of his employment depends on the discoveries he is able to make, then that man becomes a most dangerous instrument. In another case it was said that the charge of adultery will not be taken as proved, merely because a witness testifies to it; for the court must be satisfied that the witness is honest, that he is not mistaken, and that his testimony is true. To establish the charge, the evidence must be full and satisfactory—the judicial mind must be convinced affirmatively; or, as was said in *Rix* v. *Rix*, 3 Hagg., 74, although ocular proof is seldom expected, yet the proof should be " strict, satisfactory, and conclusive." It must be such, in other words, as to lead the guarded discretion of a reasonable and just man to the conclusion of the defendant's guilt. *Chambers* v. *Chambers*, 1 Hogg., 439; *Loveden* v. *Loveden*, 2 *Id.*, 1; *Turney* v. *Turney*, 4 Edw. Ch. (N. B.), 566; *State* v. *Colby*, 51 Vt., 291; *Brown* v. *Brown*, 5 Mass., 320; *Wagoner* v. *Wagoner*, 10 Atl. Rep., 221.

We come, then, to consider the charge of adultery with Mrs. Osburn. To sustain this branch of the case, a great mass of testimony had been taken, covering several hundred pages of the printed record; much, indeed most, of which is irrelevant matter, and therefore to be laid out of view. We will consider only those points in the evidence upon which stress is chiefly laid.

It appears that the plaintiff and the defendant were married in the year 1874; after which they resided on a farm near the village of Snickersville, in Loudoun county. Both were of respectable parentage and good social standing in the community. The defendant is, and for some time has been, a justice of the peace and a popular and efficient magistrate. In 1883 he removed with his family, at that time consisting of a wife and three children, to Snickersville. Mrs. Osburn was then the owner of a public house there, which the defendant

rented and occupied, taking Mrs. Osburn as a boarder, who was a relative of his and a friend of his wife, and who is described by several of the witnesses as an unusually cultivated woman, of bright intellect, and highly accomplished.

Up to the time of their removal from the farm, and for some time afterwards, the parties appear to have been happy and contented.   In course of time, however, the feelings of the appellant for Mrs. Osburn underwent a great change, although it does not appear that the change was caused by jealousy or any suspicion of infidelity to her on the part of her husband. Indeed, to several of the witnesses she asserted the contrary, saying she "never thought of such a thing."   Mrs. Osburn, it seems, had obtained a divorce from her husband on the ground of cruelty, and continued to board with the defendant for some time after his removal to Snickersville, where he continued to live until about the 1st of January, 1886, when he returned with his family to the farm.

To establish the charge of adultery, the plaintiff sought to prove : *first*, that Mrs. Osburn's general reputation for chastity was not good, and, *secondly*, that the relations between the defendant and herself were such as to warrant the inference of adultery.   But we are of opinion that neither of these propositions are established, independently of the effect which is to be given to the answer of the defendant responsive to the general charge of adultery contained in the original bill.

The evidence upon the first point consists for the most part of a mere rehash of village rumors and gossip, without any apparent foundation to justify or support them.   For example, one of these rumors was that on one occasion, while Mrs. Osburn was boarding at the house of Mrs. Ella Wilmarth, in the neighborhood, the defendant went there in a close carriage and took her out riding—which Mrs. Wilmarth, in her deposition, emphatically declares to be "utterly false."   The same witness also says : "She (Mrs. Osburn) always seemed a very delightful woman to me in every respect.   I have never seen

anything in her unbecoming a lady of the purest instinct;" and there is much more testimony to the same effect.

One of the principal witnesses introduced by the plaintiff to prove improper relations between the defendant and Mrs. Osburn is the colored woman, Amanda Mason. This witness testifies that during the time the defendant was living in Snickersville, she was employed as a servant at the house of a gentleman who lived just opposite the house in which the defendant lived, and that early one morning, as she was going into the cellar, she heard a window raised on the other side of the street; that the window was in Mrs. Osburn's room, and that, looking in that direction, she saw *a man*, having on only his shirt and drawers, raise the window; that it was about daybreak and "a moonshiny" morning, and that while she did not recognize the man's face, she thought it was the defendant, but wouldn't swear that it was he. The witness says, however, that Mrs. Osburn did not spend all of her time at the defendant's house, and that she couldn't say whether she was there at the time spoken of or not.

But be that as it may, it is proved that there are shade trees immediately in front of the window referred to by the witness which so obstruct the view from the point where the witness says she was, on the occasion just mentioned, as to render it impossible for her to have identified the defendant, or any any other person, standing at the window at that time of the day. This is shown by actual experiments since made, on a moonlight night and when there were no leaves on the trees. Besides, the general reputation of the witness for truth and veracity is shown to be "very poor," and no further comment upon her testimony is necessary.

Another witness, whose testimony is much relied on by the plaintiff, is Mary Callahan, who was a servant girl in the defendant's service, about thirteen years of age, at the time to which her testimony relates. This witness says that "one morning, while cleaning up," she heard persons talking in

Mrs. Osburn's room, and looking through the key-hole, she saw Mrs. Osburn and the defendant, the latter being in his night clothes. But her statement is shown to be an utter fabrication, as the proof is conclusive that the lock on the door was a spring lock, and that there was no key-hole or other aperture in the door through which it was possible for any one to have looked into the room, as the witness said she did: and this is a fair sample of much of the testimony in the case.

Another witness testifies that one evening, when she was in Mrs. Osburn's room, the defendant came in and took off his boots and warmed his feet by the fire. She also says he took a cup of tea in the room, and that he remained there until about 10 o'clock. It appears, however, that the defendant's wife, the appellant, was present all the time, and that the witness herself spent the night in the room with Mrs. Osburn, where, it seems, the family frequently took tea at that season of the year.

The same witness also relates that the defendant once, in passing her house, left a parcel, which contained material for ladies' underclothing, which she made up for Mrs. Osburn, and for which Mrs. Osburn afterwards sent a servant; all of which would seem to be a matter of no importance as tending to prove adultery, although much stress is laid upon it by the appellant, just as upon many other matters which are of even less significance, if possible, and which it would be both tedious and useless to mention in this opinion. That a strong attachment subsisted between the defendant and Mrs. Osburn, who, as before remarked, is an attractive woman and his cousin, is not denied; but that that attachment was criminal, is certainly not shown by this record.

Only one other point in this connection will be noticed. It appears that after the date of all the alleged occurrences just adverted to, and after the defendant and his family had returned to the farm to live, he was waited on by a committee of the Ebenezer Baptist church, of which church he was a member,

to summon him before the church to answer " as to *a report* in circulation " to the effect that he had been guilty of infidelity to his wife. One of this committee was Bushrod W. Lynn, who, as a witness for the plaintiff, says that the defendant declared himself to the committee to be innocent, but that in view of all the circumstances, he preferred to withdraw from the church, " *which*," the witness adds, "*we advised him to do*." He accordingly addressed a letter of withdrawal to the church, enclosing in it a written certificate from the plaintiff, to the effect that she had no cause to suspect her husband of infidelity to her, and that she made no such charge against him. The church, however, upon his refusal to appear, expelled him, and this, it is now urged by the plaintiff, is evidence of his guilt. We do not think so. The defendant may have had good reasons for not desiring to appear before the tribunal before which he was summoned—a tribunal not clothed with judicial power, nor governed by legal rules of procedure—and his attempted withdrawal from the church, at the advice of the church committee, may have been, and probably was, prompted by a desire to prevent publicity being given to " the rumor," of which he was informed by the committee. At all events, the circumstance, standing alone or taken in connection with the whole case, is not such as to lead the guarded discretion of a reasonable and just man to the conclusion of the defendant's guilt, more especially in view of the positive and unimpeached evidence of Mrs. Osburn in denial of the charge of adultery with her.

As to the charges of cruelty and desertion, little need be said. In point of fact, there has been no desertion of the plaintiff by the defendant, nor is it even charged that his desertion has continued for five years, and desertion for a less period is not a ground of divorce *a vinculo matrimonii.* The evidence shows that after the birth of her fourth child, several years before this suit was brought, the plaintiff declared her intention never to have another child, or to permit the defendant to occupy her bed again, since which time they have occupied

separate apartments, although there has been no actual separation, at least not until a few days before this suit was brought. The plaintiff, as a reason for her course, declared that she had as many children as she wanted, and that any more would prevent her going about and enjoying herself. It seems not to be entirely clear whether a withdrawal of one of the parties from the matrimonial bed, without any withdrawal from general cohabitation, is or is not a legal desertion; but as the question does not properly arise in the present case, we express no opinion upon it. It is certain that if there has been any desertion in the case at all, it has not been by the defendant.

In support of the charge of cruelty only one act of personal violence is proved. A few days before the suit was brought, the plaintiff and defendant became involved in an altercation about some domestic matter, when the plaintiff took up a pan of dirty water, near by, and threw the water in the defendant's face. He thereupon slapped her on the cheek, which produced a bruise, but no serious injury, and she, on the same day, left his house, and a few days afterwards commenced this suit. It is needless, however, to comment upon the evidence in this connection, for even if the charge of cruelty were made out by the proofs, that would not entitle the plaintiff to a divorce *a vinculo matrimonii.* The statute provides that "for cruelty, reasonable apprehension of bodily hurt, abandonment, or desertion," a divorce *a mensa et thoro* may be decreed. Code, sec. 2258; *Bailey* v. *Bailey,* 21 Gratt., 43; *Carr* v. *Carr,* 22 *Id.,* 168; *Latham* v. *Latham,* 30 *Id.,* 307; *Cralle* v. *Cralle,* 79 Va., 182; *Myers* v. *Myers,* 83 *Id.,* 806; *Poor* v. *Poor,* 8 N. H., 307; *Hoshall* v. *Hoshall,* 51 Md., 73.

It need only be added that as the decree of the circuit court dismissing the bill is clearly right, there was no error in not making an allowance to the plaintiff to defray the cost of her appeal. The decree is, therefore, affirmed.

DECREE AFFIRMED.