544

# Richmond

MARY D. KIRBY V. JAMES H. KIRBY.

November 17, 1932.

Present, Campbell, C. J., and Epes, Hudgins, Gregory and Chinn, JJ.

The opinion states the case.

*James G. Martin,* for the appellant.

*Thomas Helm Jones,* for the appellee.

CHINN, J., delivered the opinion of the court.

The appellant, Mary D. Kirby, filed her bill on the third Monday in October, 1930, against her husband, James H. Kirby, charging that he had frequently, within the period of a month preceding the commencement of the suit, committed adultery with a woman named Pauline Ives, and praying for a divorce on that ground.

Appellee answered, specifically denying the charge, asserting that his associations with Pauline Ives were entirely of a business nature, and that his wife's accusations were prompted solely by her unwarranted and uncontrollable jealousy.

Depositions were taken, and upon the hearing the court dismissed the bill; whereupon this appeal was taken.

At the time the acts of adultery are alleged to have been committed, the parties had been married fifteen years, and were then living together on Graydon avenue, in the city of Norfolk. They have no living children. The corespondent named in the proceedings is a young woman thirty-three years of age, who obtained a divorce from her husband August 3, 1925, on the ground of desertion. A few months before this divorce—to be exact, on April 21, 1925—appellee and Mrs. Ives, who had known each other for several years previously, went into the cleaning and pressing business together at a place on Clay avenue, in Norfolk, conducted under the name and style of "National Cleaners and Dyers,"

but it appears that appellee kept this association with Mrs. Ives a secret from his wife, and she had no knowledge of it until she was told by some unknown person, over the telephone, about a year before this suit was instituted. Prior to that time appellant had heard of Mrs. Ives, but did not know her. She testified that her husband forbade her to come to his place of business, commonly referred to as the "pressing club," and pushed her out the only time she ever went there; that she was greatly upset upon learning that Mrs. Ives was associated with him in the business, and when she asked him why he had kept it from her, his reply was: "Because I have been accused of going with her and I knew you would be jealous." Appellee does not deny these statements.

After this incident and conversation with her husband, which we deem it unnecessary to recite in detail, appellant's apprehensions seem to have been allayed until sometime in September, 1930, when she was informed by a lady closely connected with her husband's family that he "was going with Mrs. Ives." She then employed a private detective agency with the view of ascertaining the true state of affairs. On cross-examination, she testified: "I had repeatedly asked my husband if he did go with Mrs. Ives, if he took her home, and if he went to any eating place with her, and he positively said no; therefore, not being able to get anything from him, I didn't see anything to do but get detectives, and for that reason I went and employed them, and that was some time in September. I don't remember the exact date."

It was discovered about this time that the building in which Mrs. Ives had been living since October 1, 1929, known as 227-229 Westover avenue, had been rented by appellee in his own name, through his friend, W. K. Fentress, a real estate agent. At Mrs. Ives' request the tenancy was transferred to her name about the time these proceedings were begun. The building contains four small apartments —two on the first floor and two on the second. Mrs. Ives

occupied the rear apartment of two rooms on the second floor. The front apartment on the second floor had been occupied for several months during the year by a Mrs. Williams, who had vacated it, and whose whereabouts during the pendency of the suit seemed to be unknown. At any rate she was not called as a witness. Access to these two apartments is gained by a flight of steps running up from the street to an entrance hall between them, from which each of said apartments is entered through a private door. The apartments on the first floor were occupied from time to time during the year by various other tenants. While appellee and Mrs. Ives testified that her married daughter stayed with her a part of the time, and especially during the month of September, 1930, it may be said to have been established by disinterested witnesses placed on the stand by appellee, and the whole trend of the evidence, that Mrs. Ives lived alone in the apartment from the time it was rented by Mr. Kirby until after these proceedings were instituted.

J. T. Branch, head of the detective agency employed by Mrs. Kirby, assigned his associates, E. P. Renner and A. A. Brittingham, to assist him in the case, all of whom testified. It appears from the evidence of these witnesses that during the period beginning September 13, 1930, and ending October 4, 1930, inclusive, they noted the actions of appellee and corespondent on eleven separate occasions. The result of their observations may be thus summarized:

On Saturday night, September 13th, appellee and corespondent left the "pressing club" together at 11:30 p. m., and drove in one of their delivery trucks to the Belmont restaurant, where they had supper. The couple then drove to Mrs. Ives' apartment where they arrived at 12:20 a. m., and appellee remained there until 1 a. m. On Saturday night, September 20th, the same parties left the "pressing club" at 12:10 a. m., had supper together at a restaurant on Granby street, then drove to Mrs. Ives' apartment, where appellee remained from 1:10 a. m. until 2:15 a. m. On

Tuesday night, September 23rd, appellee and corespondent left the "pressing club" at 8:15 p. m., went to a restaurant and got something to eat. They then took a drive to Ocean View and the Naval Base, arriving at the same apartment at 10 p. m., where appellee remained one hour. On Wednesday night, September 24th, the parties left the "pressing club" at 7:15 p. m., had supper at a restaurant on 21st street, and after taking a short drive arrived at the apartment at 9 p. m., where appellee remained until 10:20 p. m. On Thursday night, September 25th, appellee and corespondent left the "pressing club" at 8:10 p. m., ate supper together, then took a drive, and reached the apartment at 10:20 p. m., where appellee remained until 11:10 p. m. On Friday night, September 26th, the parties left the "pressing club" at 7:50 p. m., drove around until 8:20 p. m., when they took supper at a restaurant; then went driving again, and arrived at the apartment at 11 p. m., where appellee remained forty minutes. On Saturday night, September 27th the parties in question left the "pressing club" at 11 p. m., went to a restaurant to eat, entered Mrs. Ives' apartment at 11:45 p. m., and appellee came out at 1:10 a. m. On Sunday, September 28th, appellee drove up to Mrs. Ives' apartment at 7:30 p. m. and entered it. A few minutes afterwards he and Mrs. Ives came out together, went to the Belmont restaurant for supper, then went riding and returned to the apartment at 10 p. m., where appellee remained one hour. On Saturday night, October 4th, the operatives did not follow the parties from the "pressing club," as they had done previously, but went directly to a place near the apartment and waited for Mr. Kirby and Mrs. Ives. They came up and entered the apartment at 11 p. m. and appellee remained there until 1:30 a. m. On most of the above dates all three of the detectives acted together; on a few of them only two of them were present; but each kept his own notes of the dates and hours, which corresponded in every particular.

In addition to those above specified, operative Britting-ham, on several occasions, followed the couple alone. He testified that on Friday night, September 19th, Mr. Kirby and Mrs. Ives, after closing the "pressing club" and taking a ride, arrived at the 21st street restaurant at 10 p. m., "stayed there long enough to eat, and went to the apartment on Westover avenue"; but witness did not know how long appellee remained there that night, as he did not wait for him to come out. He also testified that on Friday night, October 3rd, appellee and corespondent left the "pressing club" about 8 p. m., and witness followed them in his car. They went to a restaurant, took a long ride, and returned to the apartment at 9:30 p. m., where appellee remained until 12 a. m., or two and a half hours.

These witnesses further testified that on all the occasions referred to, appellee and Mrs. Ives invariably entered the apartment together, and appellee came out alone; that when they first entered the apartment, the lights in the two rooms occupied by Mrs. Ives would go on, and shortly afterwards one of them would be turned off; that they never saw any light in the upper front apartment; and that the delivery truck used by the couple in taking their rides was parked in front of the apartment while appellee remained there. The evidence given by the detectives is not denied or controverted by either Mr. Kirby or Mrs. Ives in any respect, the only explanation offered by them being that they were in the "pressing club" business together, and Mrs. Ives being quite deaf, he went to her apartment and to restaurants and driving with her solely to talk over matters of business in which they were interested. The gist of Mr. Kirby's testimony in chief on the subject is as follows:

"Q. At the close of your business at night, who closes the place of business?

"A. I do, and Mrs. Ives together.

"Q. When you leave there, it is charged that you frequently have dinners with Mrs. Ives. Now let me ask you again, if you please, would you mind stating at the time

of your contact with Mrs. Ives on the days in question, if you have dinner with her or if you visit her apartment or take her driving, and please follow yourself through until you get through on that day, and then take up another day so that we can understand what we are talking about?

"A. I don't recall the days because I didn't put them down, but when we leave the place of business I take Mrs. Ives sometimes to Harry Parks, sometimes to 21st and Colonial avenue, I would say, known as the Belmont restaurant, and sometimes we go to 35th and Newport avenue, and she will have dinner. Occasionally I will eat something, maybe a sandwich or a piece of pie, or a cup of coffee. I really only eat two meals a day.

"Q. What is the occasion for your taking Mrs. Ives to dinner?

"A. Because I can't talk to her in the office, and being late, I think it is no more than my duty, she being a lady, to take her on to dinner and transact the business it is necessary to be talked about.

"Q. Do you talk about business at dinner?

"A. No, sir; Mrs. Ives is deaf and I cannot talk to her in a restaurant.

"Q. Why do you carry her to dinner then?

"A. So I can talk to her after dinner.

"Q. When you leave your dinner, where do you go then?

"A. Sometimes we go to the apartment, and sometimes we ride around to Ocean View and back to Norfolk.

"Q. When you go to the apartment what is the specific object of going there, and what are you engaged in while you are there?

"A. Checking over records, the books, and checking the tickets for the past week and seeing if all the clothes have been delivered and paid for, and those who have charges, and checking each driver up.

"Q. What is the time you consume, how many hours, days, or weeks, does it take to make that check up?

"A. About an hour or two hours to check a week's work.

"Q. Why is it you have to ride in an automobile to talk to Mrs. Ives?

"A. I can't talk to her in her apartment because she is deaf and other people live in the apartment. We don't care to discuss business so everybody can hear it."

Mrs. Ives' testimony in regard to the automobile rides, the nightly suppers, and appellee's visits to her apartment is to the same effect. She says that they went riding to talk about business because she was "hard of hearing," and they could not discuss such matters at the plant, with their employees and other people going in and out; that when they got through their work for the day "we were both hungry, and we went out together and got some supper or something to eat;" that Mr. Kirby came to her apartment to check up the books; that she could not remember the hours these visits took place; that "he would not stay over an hour or maybe an hour and fifteen minutes, something like that, but never longer at a time;" that she could not say how often Mr. Kirby came to her apartment, but "he would come when it was necessary to come."

In reference to renting the apartment in his own name, appellee testified that he rented it for Mrs. Ives because they wanted to charge her $25.00 for each apartment. "She could not pay $50.00 a month rent and make anything out of the apartments, and she spoke to me about it, and I said: 'I can get it cheaper than that.' I went down and talked to Mr. Etheridge and Mr. Fentress and told them I would give them $35.00 a month for it inasmuch as it had been vacant for so long, and they agreed, after a couple of days, to accept $35.00 and Mr. Fentress put the rent in my name and it is in my name at the present time." That he could get it cheaper because he had formerly worked for the firm with which Mr. Fentress was connected and knew the condition of the apartment and how long it had been vacant.

Mrs. Ives says nothing about this in her testimony. Neither does Mr. Fentress, who had charge of the rental

of the apartments, say that Mrs. Ives had negotiated for them. On the contrary, he testified he had no dealings whatever with Mrs. Ives as to the apartments until she called him up over the telephone sometime during the week previous to October 22, 1930, and requested him to change the tenancy from Mr. Kirby's name to hers. He testified on cross-examination that when he rented the apartments to Mr. Kirby he asked him: "Whose name do you want them put in?" and he said: "Put them in mine." "I joked him, and told him he was a fool for doing that."

"Q. Did he say anything about the lady who occupied them?

"A. No, not a thing.

"Q. Why did you tell him he was a fool for putting it in his name?

"A. Well, I just suspected—I didn't know. I didn't see why Kirby would be renting another apartment when I knew his family relations at home on Graydon avenue."

This witness further testified that the rent for the apartments was paid at the office every month in cash; that he was not certain who paid it, but receipts for the same were sent to Mr. Kirby.

Appellee does not deny any of this evidence except to claim that Mrs. Ives and not he collected the rents from the subtenants, and paid the monthly rental for all the apartments.

It was also testified by B. A. Russell, a truck driver, employed by appellee and corespondent, that at Mrs. Ives' request he sometimes collected rents from the subtenants for her, and the first of every month she gave him $35.00 to take to the rental agents to pay the rent, always taking a receipt therefor in Mr. Kirby's name, which he delivered to Mrs. Ives. It further appears that Mrs. Ives acted as treasurer and handled all the cash. Neither of the parties explain whether the rent was paid out of the common fund or to whose account it was charged.

There is other evidence in the record, relied on by the appellee, which should perhaps be noted, though it seemingly has little bearing upon the issue involved. It was testified by M. E. Giddens, one of the subtenants on the first floor, that when he went up to Mrs. Ives' apartment to pay his rent on Friday nights, he would sometimes see Mr. Kirby there checking up books, etc., and never found him doing anything else, nor saw anything improper on these occasions.

A Mrs. Gibbs testified that she occupied the rear apartment on the lower floor for about five months from February, 1930, and sometimes paid her rent to Mrs. Ives at the "pressing club," and at other times Mrs. Ives would send to the bakery where she worked for the rent. Two colored employees, Sydney Rogers and Henry Jones, testified as to their respective duties, and the several activities of appellee and corespondent at the "pressing club"; Rogers also testifying that while Mrs. Ives is "hard of hearing," she could hear well enough to transact business with the employees and customers who came to the plant.

G. C. Martin testified that he knew Mrs. Ives six years before when she worked for him at a dairy plant; that she was an average employee, and he observed no conduct on her part which reflected upon her character. H. C. Macon, another character witness, testified that he had known Mrs. Ives twelve or fifteen years, and her reputation was good; but on cross-examination admitted he had never visited her house at any time, and did not know where she lived. M. J. O'Connor, a member of the Norfolk police force, testified in regard to a so-called "raid" made by himself and other officers in the neighborhood of Mrs. Ives' apartment on the night of October 4, 1930, at a time when Mr. Kirby was there, which had been referred to by Detectives Branch, Renner and Brittingham in their testimony. We find, however, nothing in the evidence relating to the incident which throws any material light on the question at issue, and for that reason deem a discussion of the same

unnecessary. Considerable testimony was also adduced as to the identity of a Miss Wilson, who worked at the "pressing club" the first two years after it was started, and as to appellant's financial worth. This evidence likewise appears immaterial and irrelevant, and requires no comment.

■ We come now to the question, Is the evidence sufficient to sustain the charge of adultery alleged in appellant's bill? After careful consideration of the whole record, we feel constrained to say we think it is.

■ While the evidence is circumstantial, as frequently said in cases of this kind, "ocular proof is seldom expected." Adultery is peculiarly a wrong of darkness and secrecy, wherein the parties are rarely surprised; hence it follows that ordinarily the evidence is of necessity circumstantial. 2 Bishop Mar., Div. & Sep., section 1351.

■ In *Johnson* v. *Johnson*, 154 Va. 788, 153 S. E. 670, 671, Mr. Justice Holt, in discussing the rule by which such evidence must be measured, says: "Judge Lewis, in *Throckmorton* v. *Throckmorton*, 86 Va. 768, 11 S. E. 289, 290, gives us a fine yardstick. 'It must be such * * * as to lead the guarded discretion of a reasonable and just man to the conclusion of the defendant's guilt.' From its very nature, it must often be circumstantial, and circumstantial evidence in such cases is governed by the ordinary rules which obtain when it is elsewhere under consideration. Common sense and the common experience of men are our best guides."

■ In 2 Bishop on Marriage, Divorce and Separation, sections 1359, 1360, the rule is thus stated: "The rule for the sufficiency of the proven facts to infer adultery is that, if they are not reasonably reconcilable with the assumption of innocence yet are so with that of guilt, the conclusion of guilt will be authorized. But it will not be if either they can be reasonably reconciled with innocence, or cannot with guilt. Circumstances merely suspicious are inadequate, though there are degrees of imprudence from which the

offense will be presumed. Still care and circumspection should attend all dealings with this class of evidence."

As shown by the evidence of the detectives, during a period of twenty-two days they followed Mr. Kirby and Mrs. Ives after they closed their shop for the night on eleven different occasions and on each of those occasions they had supper together, took an automobile ride and then repaired to Mrs. Ives' apartment, where appellee remained for various periods of time. As before stated, this evidence is not only undenied, but practically admitted by both of them. In fact, it may be fairly assumed from their own testimony that the actions detailed by the detectives had been their usual, if not daily, practice. How long it had been going on does not specifically appear, and is more or less immaterial, but their own evidence and the surrounding facts and circumstances strongly indicate that it had continued for a considerable length of time, and was even being continued during the pendency of this suit.

We then have here a married man who, while living with his wife and possessing her trust and confidence, engages a private apartment in his own name for a divorced woman, where he repeatedly visits her from nine to one o'clock at night, remaining with her in the seclusion of the apartment for from forty minutes to two and a half hours at a time. In the meantime, in order to cover up his inconstancy, he tells his wife, according to her undisputed testimony, that he does not come home to supper because he eats only two meals a day as he is "getting too fat," and that he had to stay out late at night because of business at the shop; also declaring to her that Mrs. Ives' daughter lives with her, and that he never visits her or takes her anywhere, the falsity of which statements is shown by his own testimony on the witness stand, to say nothing of that of other witnesses.

We do not think this conduct on the part of the appellee is reasonably reconcilable with his innocence. On the other hand, in our opinion, when viewed in the light of "common

sense and the common experience of men," it is not only sufficient to create suspicion, but quite adequate "to lead the guarded discretion of a reasonable and just man to the conclusion of his guilt," in the absence of a reasonable and satisfactory explanation of such conduct.

As already seen, appellee attempts to justify his course of conduct with Mrs. Ives on the ground of her deafness and their business relations. His testimony on the subject is obviously evasive and equivocal. He says he takes her out to dinner because on account of her deafness he cannot talk to her about business matters at the office; that he takes her driving in the truck because they cannot talk about business in a restaurant; and that he goes to her apartment solely to check up the books, etc., which requires from "one to two hours per week." He does not explain, however, why, during a single week in September, it was necessary for business purposes, in addition to the time devoted to dining and driving with her, to spend an average of one hour each night in Mrs. Ives' apartment for five consecutive nights, nor does he explain why, on the Sunday immediately following these visits, it was necessary for business purposes that he should drive up to Mrs. Ives' apartment at 7:30 o'clock in the evening and take her out to dinner, drive around with her until 10 o'clock, and then spend an additional hour with her alone in her apartment.

In the last analysis, the only reason assigned by Mr. Kirby for his course of conduct with Mrs. Ives is, that they had many important private business matters to "talk" about, and it was necessary for them to be alone in order to do so, because Mrs. Ives is deaf. But neither of them undertakes to explain why they could not equally as well have "talked" about their affairs and "checked up the books" after business hours in their own office. They closed up the shop every evening themselves, and, if it was necessary for them to be alone, as they claim, they could there have been as free from interference as they pleased. Moreover, that would naturally seem to be the most convenient and ap-

propriate place to keep the records and discuss the business matters upon which they place so much stress. The fact that they did not do this instead of resorting to the incriminating tactics employed, makes it manifest that Mr. Kirby's excuse—that it was necessary for him to constantly drive around with Mrs. Ives and visit her apartment as he did, for the reasons alleged—is purely fictitious, and resorted to for the purposes of this suit. In fact, to say that a little cleaning and pressing business, such as that conducted by the parties, involved matters of such consequence and importance as to require all these hours of intimate association for the discussion of business secrets seems too farcical on its face to warrant credulity.

We fully realize the principle that when the evidence relied on to prove adultery is circumstantial it should be carefully scrutinized and acted upon with caution, and that it must be such as to convince the "guarded discretion" of the chancellor that the act has been committed. At the same time, circumstantial evidence proceeds upon the doctrine of presumption (2 Bish. Mar., Div. & Sep., section 1358), and when the combined facts and circumstances of the instant case, including the obviously artificial defense offered by Mr. Kirby in explanation of his relations with Mrs. Ives, are considered from the standpoint of common sense and common human experience, we think the charge of adultery must be conclusively inferred.

It is, of course, possible, as argued by counsel, that appellee visited Mrs. Ives' apartment without committing adultery with her; but we are not dealing with bare possibilities or conjectures. The question before us is what reasonable inferences should be drawn from the fact of those visits, viewed in connection with the other proven circumstances. These circumstances it is needless to repeat. Suffice it to say that we think they are fully sufficient to justify the conclusion that Mr. Kirby's visits to the apartment, to which corespondent lent her ready as-

sent and connivance, were for immoral purposes, and this being the case the act will be inferred.

"In a suit for divorce, adultery may be proved by circumstantial evidence of a clear and positive nature, showing opportunity as to time and place, and leading the mind to conclude by fair inference from all the circumstances that the act was committed." *DeBerry* v. *DeBerry*, 104 W. Va. 209, 139 S. E. 710, and cases cited.

In 2 Bishop on Marriage, Divorce and Separation, section 1361, the author says: "The inference of guilt or innocence to be drawn from the proven circumstances, does not depend on technical rules. * * * 'Courts of justice,' said Lord Stowell, 'must not be duped. They judge of facts as other men of discernment, exercising a sound and sober judgment on circumstances that are duly proved,' judge of them. * * * The facts are not of a technical nature; they are facts determinable upon common grounds of reason; and courts of justice would wander very much from their proper office of giving protection to the rights of mankind, if they let themselves loose to subleties and remote and artificial reasonings upon such subjects. Upon such subjects, the rational and legal interpretation must be the same!" See also *Musick* v. *Musick*, 88 Va. 12, 13 S. E. 302.

It is finally contended by counsel for appellee that the appellant condoned the offense. After a careful consideration of the evidence relied on, we are of the opinion that it fails to sustain this contention, and therefore do not consider it would serve any useful purpose to further prolong this opinion by a discussion of the question.

For the reasons stated, the decree complained of is reversed, and the cause remanded to the court below for such further proceedings therein, in accordance with the prayer of the bill as to alimony and counsel fees, as the parties may be advised, and the court may deem proper.

*Reversed and remanded.*