# 𝔕𝔦𝔠𝔥𝔪𝔬𝔫𝔡

ALEXANDER L. MARTIN V. VIOLET JOLLY MARTIN.

March 12, 1936.

Present, Holt, Hudgins, Gregory, Browning and Eggleston, JJ.

The opinion states the case.

*Fulton & Hall, McC. G. Finnigan, T. Dix Sutton, W. Griffith Purcell* and *A. J. Baroody,* for the appellant.

*Alfred J. Kirsh, Leon M. Bazile* and *W. Kirk Mathews,* for the appellee.

HOLT, J., delivered the opinion of the court.

This is a suit for divorce. The plaintiff, Dr. Martin, in his bill and amended bill, charges cruelty, that his wife deserted him without cause, prays for divorce *a mensa* and that the decree may be merged later into one for absolute divorce. He also asks that the custody of their infant child be awarded to him.

His wife in her answer denies these allegations and in her cross-bill charges him with repeated acts of adultery, asks that there be decreed to her an absolute divorce, the custody of their infant child, and an allowance for their support.

Dr. Martin is a physician practicing in Richmond and thirty years old. His wife, Violet Jolly Martin, is twenty-eight. They were married on February 24, 1925, and their infant child, a son, was born on February 3, 1926. Mrs. Martin left her husband on August 17, 1932. This suit was brought in September, 1932. Final decree therein was entered on June 4, 1934.

A divorce from bed and board may be decreed for cruelty or desertion, Code, section 5104, and one from the bonds of matrimony for adultery, Code, section 5103 (as amended by Acts 1926, ch. 517). Causes of this nature usually turn upon the facts. In most cases the law applicable thereto has long been settled, adequately stated and generally accepted.

Dr. Martin testified that his wife was unreasonably jealous and without cause, that she drank and took drugs to excess, was neurotic, at times hysterical, and on at least two occasions attempted to kill him. He said that on the morning of August 17, 1932, she attempted to cut his throat with a knife, and that in March, 1932, she attempted to asphyxiate him by turning on gas from the kitchen stove. Particularly, he tells us that without cause she charged that he was maintaining unlawful relations with a professional nurse, Miss Nettie Charles Kemp.

Because of antecedent complaints on the night of May 19, 1931, a conference between his wife, himself and Miss Kemp was by arrangement held in his automobile on one of Richmond's streets. On that occasion both he and Miss Kemp protested their innocence; this agreement, however, was reached. "I was to cease seeing the girl and my wife was to drop the matter." This agreement he did not keep. Miss Kemp was then living at 804 or 806 West Grace street. In October, 1931, she moved to apartment No. 4 at 3131 Hanover avenue, where she continued to live until March, 1932, at which apartment she was known as "Mrs. Charles." He visited her frequently there. When questioned as to the reasons for these visits, answered:

"Q. Why was it necessary for you to personally frequent that apartment both day time and night time?

"A. Well, at times I was called there; there were other times I just went by there.

"Q. By whom were you called and for what purpose did you go there?

"A. Well, I was called by this particular woman at times, and I just stopped in for no particular reason at all, at other times."

Elsewhere he said, "She (Miss Kemp) was more or less black-listed on the nurses' register, as my wife called up the hospital and proceeded to try to get her to lose her position, and later on in the year I gave the girl some more work and came in contact with her in that way."

When asked to name those from whom she secured

work at his instance, he could give but one name. That was a surgical patient at a hospital. He recommended her to no other physician. He also tells us that he saw no name on the door of this Hanover avenue apartment to indicate its occupants, and that he never visited Miss Kemp at a nearby county home after she had left town.

When asked about visits to other women of questionable character, he said that such visits were strictly professional.

Mrs. Martin denies that she ever drank or took drugs to excess, or that she ever attempted to cut her husband's throat. She does say that she attempted to poison herself and that she turned on the gas from the kitchen stove. On this occasion she went back, got in bed with her husband and was asphyxiated into insensibility. She tells us that the reason for these attempts was the attention which he was paying to other women, coupled with the fact that he told her that he no longer loved her and suggested that she get a divorce. In short, her statement is that life had become unbearable.

She tells us of changes in her husband's attitude towards her and of their discussion of Miss Kemp for the first time in August, 1930, when he admitted that he was in love with this woman. Matters went from bad to worse until the automobile conference which we have noted was held. She tells us what was then said and done:

"A. This Kemp woman got in the car and neither Dr. Martin nor the Kemp woman said anything. I turned to the Kemp woman and asked her how could she treat me as she had after supposedly being a friend, and she answered me in an airy way that she did not know; that she was in love with him and that she would never give him up as long as she stayed in Richmond. I asked her how long this had been going on. She said it had been going on about—and before she could reply Dr. Martin filled in that question—"about six months," as he had told me the time before we left the house. I asked Dr. Martin if he was going to marry her. He said he was. Then she

said: "Are you going to let us have the little boy?" I said no one would get my child except over my dead body. She asked Dr. Martin what he was going to do. He said he would make a decision after we arrived home. She said please not keep her in suspense; to call her as soon as he made his decision. After we got home Dr. Martin and I went to our rooms and I asked him what he was going to do. He said that he loved this Kemp woman. I then made the reply that if marrying her would make him happy—that he could do it. He said then he would go down and telephone her from his office that he was through; that he was going to live with me—under one condition and that was that I was not to go to the extension telephone upstairs, pick it up and listen to the conversation, which I did not do. He returned in about half an hour after he left me. I do not know what the conversation was, nor would he tell me except that he was through with her.

"Q. At that time did he make any promise to you with reference to the Kemp woman?

"A. That he was not to see her any more."

She tells us what occurred on the morning of the day of final separation:

"I had been in the habit of taking Dr. Martin's coffee to his bedside, so that morning I took it to him as usual and I woke him. I said Dr. Martin, here is your coffee, and he said: 'Oh, Nettie, is that you?' When he made that remark I set his coffee down on the stand and I said —Alex. Martin, what did you say, and he said—oh, what did I say. I said you know what you said. He said—I thought it was my sister here with her little daughter, whose name is Nettie Grace, but with the tone in which he said it, I knew he did not mean any baby, and I left him and went on in the kitchen, to get breakfast for the little boy and myself. The atmosphere was not very pleasant and he said that I need not be so uppish, that he knew a few things about me, and I asked him what he meant. He said I had been going down to Ellerson's put-

ting out false statements and trying to trace him, which I denied. I went on in the bedroom and was making beds. Dr. Martin had finished his bath and had come in the bedroom to dress. Then he started saying that if I could not own up to the things that I had been telling down at Ellerson's, that he was through. He then left the bedroom and went into the living room to put his shoes on, and I followed him. I sat on the edge of the table and told him if he was through with me, after all the things I had taken off him and forgiven him for, that he made me feel like I had murder in my heart and I would like to cut his throat from ear to ear, and that he had said he was through— now I was through, and I left the living room and before I could get in the bedroom Doctor put his arm around my waist and pulled me down on his lap and he tried to kiss me. I put my hand on his mouth and told him he would never remember the day his lips touched mine again; that I was through and to let me up, which he did, and I went on and finished making the beds and he left."

As a matter of fact she did kiss him when he left home on the afternoon of that day.

Mrs. Martin's distrust of her husband remained. She thought that she had seen him driving about town with Miss Kemp. She consulted counsel, who on January 16, 1932, employed Col. Frank Morgan, a private detective, to ascertain what were the facts. Morgan made his first and final report on August 17th of that year. He testified that Dr. Martin was a frequent visitor at the Hanover avenue apartment, that on its door was the legend, "Mr. and Mrs. Charles," and that Dr. Martin was there known as Mr. Charles, the husband of Mrs. Charles. The lease itself was to Mrs. Nettie Charles.

William Gaines was janitor at 3131 Hanover avenue. He tells us that he saw Dr. Martin in apartment No. 4 coming and going almost every day. Miss Kemp told him that he was Mr. Charles. On the occasions on which this witness saw these people he was dressed as he usually is and Miss Kemp was dressed in pajamas.

E. M. Burnett, another witness, was an ice man who bought ice from the factory and delivered it on his own account. Among his customers was this Hanover avenue apartment. His hours of delivery were between seven-thirty and nine o'clock in the morning. The only man he ever saw there was Dr. Martin. He saw him several times. Usually he was fully dressed, but at times he was in his shirt sleeves, while Miss Kemp was in pajamas.

It is true that the evidence of private detectives should be examined with the utmost care. Uncorroborated it is seldom sufficient in cases of this kind to sustain any judgment, as was said in *Throckmorton* v. *Throckmorton,* 86 Va. 768, 11 S. E. 289, 290, he is "a most dangerous instrument."

It is also true that a divorce should not be granted on the uncorroborated testimony of the parties or either of them, Code, section 5106 (as amended by Acts 1928, ch. 126.) Corroboration rests in the facts and circumstances of each case. Only those facts necessary to the judgment must be supported. "Confirmation is not necessary for that removes all doubt, while corroboration only gives more strength than was had before." *Timberlake's Adm'r* v. *Pugh,* 158 Va. 397, 163 S. E. 402, 404; *Burton's Ex'r* v. *Manson,* 142 Va. 500, 129 S. E. 356; *Brown* v. *Coates,* 165 Va. 254, 182 S. E. 554. It need not rest in the testimony of witnesses but may be furnished by surrounding circumstances adequately established. *Rogers* v. *Rogers,* 89 N. J. Eq. 1, 104 A. 32. Plainly there has been corroboration in all essential matters.

Plaintiff relies also upon condonation. Code, section 5110. "Condonation is a matter of specific affirmative defense which must be specially pleaded, and the burden of proof is upon the defendant." *White* v. *White,* 121 Va. 244, 92 S. E. 811, 812. Condonation is conditional forgiveness. Knowledge is necessary. One cannot condone what one does not know. Moreover, it is essential that there be no repetition of the offense. Repetition revives the right to complain of an injury forgiven. *Owens*

v. *Owens,* 96 Va. 191, 31 S. E. 72, 74; *Elder* v. *Elder,* 139 Va. 19, 123 S. E. 369; 2 Bishop on Marriage and Divorce, section 269.

If the agreement reached at the automobile conference was condonation, the consideration was Dr. Martin's promise to break away from Miss Kemp. That promise he did not keep. But Mrs. Martin, although her suspicions had been aroused, was in possession of no definite information until Morgan's report on August 17, 1932.

Evidence of adultery should be clear. Suspicious circumstances are not enough, but confirmation beyond a reasonable doubt is not required. Necessarily evidence is usually circumstantial. Few offenses are less susceptible of positive proof. 2 Bishop, Mar., Div. & Sep., section 1351. Undue credulity is not demanded. *Ford* v. *Engleman,* 118 Va. 89, 86 S. E. 852. Common sense and the common experience of men are our best guides.

We do not think Mrs. Martin drank to excess or was a drug addict. It is true that her conduct was at times irritating and that she made life in the home difficult. Responsibility for this in the major rests upon the husband. He had been paying undue attention to Miss Kemp; because of this the triangular conference was held. While protesting innocence he promised to break off relations with her. This he did not do. She moved to the Hanover avenue apartment. He visited her there almost daily. Its lease was taken out in the name of "Mrs. Charles." On the apartment entrance door was written "Mr. and Mrs. Charles." He was known there as "Mr. Charles." For his presence he has given no excuse. Miss Kemp said that he was "Mr. Charles" and received him frequently informally attired. Some one must have paid for the lease. Miss Kemp was a black-listed nurse and was out of employment. Can any man of common sense have doubt as to what their relations were during this period. We think not. This case falls within the principles stated at some length in *Johnson* v. *Johnson,* 154 Va. 788, 153 S. E. 670, and in *Kirby* v. *Kirby,* 159 Va. 544, 166 S. E. 484. Nothing

can be gained by paraphrasing what we have already written—not even a reputation for erudition.

It is charged that Dr. Martin continued to visit Miss Kemp after she left the Hanover avenue apartment. It is also charged that he visited other women of questionable character. The chancellor below did not rest his judgment on these charges, nor do we. It is not necessary. Those considered amply sustain him.

If the husband was guilty of adultery, the wife had a right to leave him.

 When a court is called upon to award the custody of a child of tender years to one of its parents, the welfare of that child is of paramount importance. In *Owens* v. *Owens, supra,* Keith, P., said:

"The innocent parent on whose prayer the divorce is granted will usually have the custody of the children. A woman compelled by her husband to resort to divorce ought not to obtain it at the expense of losing the society of her children. And as one who has done well or ill in the marriage relation will be likely to do the same in the parental all courts lean to the innocent parent when determining the custody of the child. 2 Bish. on Marriage and Divorce, section 1196."

 The allowances for maintenance of the wife and child are matters within the sound judicial discretion of the chancellor. In the instant case he has very properly reserved the right to make such changes as changing conditions may demand.

We find no error in the decree of the court below, and it is affirmed.

*Affirmed.*