# Richmond

WILLIAMSON LEE WADE V. ANNIE HANKLA WADE.

February 20, 1939.

Record No. 2023.

Present, All the Justices.

The opinion states the case.

*Carleton Penn,* for the appellant.

*A. L. Hughson* and *Paul S. Johnson,* for the appellee.

BROWNING, J., delivered the opinion of the court.

The parties hereto will be generally referred to as the plaintiff and the defendant, the relation they occupied in the trial court.

They were married on February 26, 1936. The plaintiff was seventy-five years old and the defendant was fifty. Each of them had been married before and each had children of their former marriages. The plaintiff has lived in the town of Vinton, near the city of Roanoke, for more than forty years. He had reared a large family. His children were grown and had left home. Most of them were married and some of them were living in Vinton and Roanoke. He owns a comfortable brick bungalow and was living alone. He had been employed for nearly all of his adult life by the Norfolk and Western Railway Company, but is now on the pension list, receiving about fifty dollars per month. This is his only income. For a short while he had a housekeeper to look after him, but later he conceived the idea of renting his house to some one who would allow him to reserve a room and furnish him board for the rent. He put a "For Rent" advertisement in one of the local papers and this was answered by the defendant, who was, at that time, Mrs. Hankla. That was the occasion of the meeting of these persons.

The defendant followed this up by calling the plaintiff over the telephone and telling him that she had a notion to accept the rental proposition. Subsequently she went to see him and in a short while a proposal of marriage was made, which Mrs. Hankla accepted. They went on a bridal trip to Savannah and Florida. On their return they began house-keeping in the bungalow.

Soon the old, old story was realized—"Marry in haste and repent at leisure." They didn't get along smoothly. Their natures clashed. The old gentleman was urbane, quiet and kindly, except that he had an economical turn of mind which brought on occasional disputations with his wife. She was impetuous, excitable and belligerent, and the

language which she applied to him was not always the most chaste or the most temperate. This appeared with outbursts of temper when expletives were used which, until this modern day, were thought to come within the exclusive right of the masculine members of society. She added fuel to the flames by having her son first, and then him and his wife and her granddaughter to come and live with them. They paid, when they could, a small amount for board and lodging. Finally the plaintiff notified the young man to leave, which he did.

In the summer of 1936, following their marriage, things had become so intolerable, as he testified, that he left the home and went to that of one of his children and instituted suit against her for divorce, in the Circuit Court of the county of Roanoke. Before this proceeding had progressed to the point of a decree, the plaintiff returned to his home and his wife, in an effort to heal their differences and live peaceably together again. The second effort was not more fruitful of happiness than the first.

On November 9, 1937, while the plaintiff and defendant and defendant's granddaughter, a child ten years old, were at dinner, the discussion of a trivial domestic matter between the husband and wife resulted in an outburst of temper upon the part of the defendant, who struck her husband a violent blow on the top of his head with a heavy plate of victuals, cutting his head in several places, and shivering the plate in pieces, one of which struck his hand and cut a finger. The food was thrown over him, most of it on his waistcoat.

After testifying that her husband had chided her for not teaching her grandchild better manners and saying some other uncomplimentary things to her, she described her part in the scene as follows: " * * * I didn't see what right he had to call me that right there in Dorothy's presence; but he kept quarreling, and I picked up a plate from the table—a salad fruit plate that had vegetables in it—and started to take them on my plate, and at that minute he was still quarrelling with me and my nerves were so

on edge that I jumped up and started to throw the plate down on the table, but I turned and threw it at the breakfast room cabinet. My nerves were so on edge that I couldn't hardly stand it, and with that I jumped up and started through the living room; and I tell you he just tried every day to make my life miserable, always finding fault and grumbling, and when I get mad like that—he was after me so many times—I do things I would not do other times. * * * "

The plaintiff went at once across the street to the home of a neighbor and called the town policeman. He remained at this house until the officer arrived, when the two went over to the plaintiff's house where the officer talked to the defendant in the plaintiff's presence.

The testimony of the officer and that of the woman, from whose house the plaintiff telephoned, showed that the plaintiff was in a highly nervous state and was afraid to go alone to his own home. Subsequently, he went to his room and locked himself in. The next afternoon he went to bed ill. One of his sons was notified, and he called a physician at once, who directed that the plaintiff be taken to a hospital. This was on the 11th of November, Armistice Day. The defendant started to Roanoke early that morning without seeing her husband or acquainting herself with his condition, and remained until mid-day, when she returned for her lunch, but did not visit the plaintiff's room and did not see him at all on that day. He was taken to the Lewis-Gale Hospital in Roanoke, where he remained for sixteen days. She did not visit him at all for two weeks. Just before he was discharged she went to see him on the 24th and 25th of November. The plaintiff alleged that these visits were only to induce him to return to his home and not proceed further with the suit. The idea sought to be impressed by the plaintiff was that she had no real affection for him and that no sentiment could be attached to the visits. The plaintiff's brief urges that she was only moved by a desire to preserve her marital status, that she might profit by it in the event of his passing away.

The evidence is quite voluminous, eleven witnesses testifying for the plaintiff and two for the defendant, the latter being the defendant herself and her little granddaughter.

It is conclusively shown that the defendant went to Roanoke nearly every day without informing her husband where she was going, with whom she associated, and when she would return. When questioned, she told him that it was none of his business, using the emphatic expletive.

The Rev. J. Harry Smith, the minister in charge of the Methodist Church at Vinton, testified that the defendant told him that the marriage meant nothing to her—that it was merely a matter of business. She denied that she said this, as she did almost everything else that was uncouth and vituperative, which was attributed to her.

It will be observed that in her account of the dinner table incident she said that she threw the plate at the kitchen cabinet. She further said that pieces of the plate rebounded upon the head of her husband.

The police officer, M. H. Barton, who was the first person to see and talk to her after the incident, testified that when her husband charged her with hitting him, her reply was, that she did it to protect herself. He said that she did not deny striking him, and when her husband charged her with having gone out and left him in bed when he was sick she "gave him to understand that she would go whenever she got ready and come back when she got ready. If I mistake not, those are the words she used; and she said, 'if you don't like it, you can leave.' "

It is in evidence that she threatened to kill him; in fact, the officer testified that he charged her with this, in his presence, and that she did not deny it.

The plaintiff, by the testimony of some of the most reputable citizens of the town, established an enviable reputation for veracity and peaceableness.

The suit was based on the charge of cruelty and desertion. The evidence conclusively proves it. It would not be conducive of any good to go into its gruesome details.

The trial court entered a decree declining to grant the plaintiff a divorce, and directed that the cause be dismissed and stricken from the docket at the cost of the complainant.

In our judgment the defendant was grievously at fault. She was cruel to her husband in applying to him opprobrious names; in developing what really became a wanderlust and absenting herself from the home; in neglecting her husband when he was sick and needed the attention and comfort that only a wife can supply, and in finally striking and wounding him in an ebullition of temper. He made an effort to effect a reconciliation. It was a hopeless failure. It was worse, because it resulted in the assault upon him. To expect him to make another effort in that direction would be inhuman. He is entitled to a divorce in accordance with the prayer of his bill. He is heavily involved in debt. His home is mortgaged to nearly its value. She is a comparatively young woman, in robust health. He is a tottering old man, incapable of performing physical labor,—hardly able to take care of himself.

She is not entitled to alimony, and none will be awarded her.

The following cases decided by this court are controlling: *House* v. *House,* 102 Va. 235, 46 S. E. 299; *Gentry* v. *Gentry,* 161 Va. 786, 172 S. E. 157; *Martin* v. *Martin,* 166 Va. 109, 184 S. E. 220; and *Babcock* v. *Babcock, ante,* page 219, 1 S. E. (2d) 328, handed down at this term of the court.

We reverse the decree of the trial court and a decree may be here entered granting the plaintiff a divorce in accordance with the prayer of this bill.

*Reversed.*