# Richmond.

## HAMPTON V. HAMPTON.

### December 4th, 1890.

1. DIVORCE—*Adultery—Evidence—Admission—Letters.*—In suit for divorce the bill cannot be taken for confessed, and whether answered or not shall be heard independently of admissions of either party, and its charges proved by full and clear testimony; and evidence that defendant admitted the charge, and a letter from her purporting to admit it, are inadmissible.

2. IDEM—*Case at bar.*—The evidence, whether direct or circumstantial, disclosed by the record in the case here: *held,* inadequate to establish the charges in the bill.

Appeal from decree of circuit court of Loudoun county, rendered October 18th, 1888, in the cause wherein Jonah N. Hampton was complainant, and Monemia F. Hampton, his wife (the appellant here), was defendant. Opinion states the case.

*J. B. McCabe,* for the appellant.

*J. H. Alexander,* and *E. Nichols,* for the appellee.

FAUNTLEROY, J., delivered the opinion of the court.

The bill charged adultery committed by the defendant, Monemia F. Hampton, with J. Frank Hampton, the brother of the complainant, and the court made the decree appealed from, that the charge of adultery against the defendant, made

in the bill, was fully proved; and adjudged, ordered and de-
creed "that the marriage between the said Jonah N. Hampton
and Monemia F. Hampton be dissolved and annulled; and
that he is hereby forever divorced from his said wife, Monemia
F. Hampton (*nee* Stocks), and all her right, title and interest
in and to the property, real and personal, of said Jonah N.
Hampton, shall henceforth cease and determine, and he shall
retain and be entitled to the custody of his child."

With the bill a letter, purporting to have admitted the fact
of the adultery as charged in the bill, was filed as part of the
bill, and the testimony of the complainant's mother and
others was taken to prove the admission of the defendant of
her adultery with the brother of the complainant.   The testi-
mony and explanations of the defendant wife were excluded,
and as the court expressed no opinion and alleged no reason
specifically, the presumption is that the decision of the court
was, in a great measure, influenced by the letter and alleged
admissions.   These should have been excluded under the law,
section 2260, page 561, Code 1873.   "Such suit shall be insti-
tuted and conducted as other suits in equity, except that the
bill shall not be taken for confessed; and whether defendant
answer or not, the cause shall be heard independently of the
admissions of either party, in the pleadings or otherwise."   1
Minor's Inst., 256, says: "It is an established maxim that a
divorce is never to be decreed for adultery (or, indeed, for any
other cause) upon the confession of the parties merely without
auxiliary proofs, experience having shown that such a practice
is productive of collusion and other flagitious frauds."

The defendant wife answered the bill, and, responding to its
charges, utterly denied them, and most emphatically the
charge of adultery.   After narrating what did occur, and how
her husband had deliberately and systematically practiced
upon her hopes and her fears by persuasions, threats and
promises to inveigle and drive her into the alleged confession,
the answer says, "He was the stronger and she the weaker

party in distress, and without suspicion that the so-called admission, thus extorted from her, would be used against her to accomplish her ruin and disgrace. He first divested her of all her property rights and placed his own beyond reach, and then threatened separation and loss of her only child, which he executed by taking possession of him and sending her to her father's, and throwing her out upon the world helpless, impoverished and disgraced. But one conclusion can be formed—that he has gone deliberately to work to defraud her of her property rights and to secure a divorce by false and fraudulent pretexts. Respondent asseverates her entire innocence of the charge of adultery with said J. Frank Hampton, or with any other person. She protests against the loose and indefinite expressions used by her in the letter filed, or before his mother, or her father being used as evidence against her to show her guilt as an adulteress, and she calls for strict proof of any act of adultery; and, if the brother is not an accomplice, he will respond and say whether such unnatural conduct as is ascribed to him be true or not, and to him she looks with confidence for complete exculpation and vindication."

This answer, though not in itself evidence, or having the effect of an answer called for under oath, yet makes up the issue, and calls for full and strict proof of the charge made in the bill; and, by the nature of the cause, even if there were no denial in the answer, or no answer in the cause, or though it expressly and unqualifiedly admitted the charges of the bill, yet the complainant is under the obligation to establish, by full, clear and adequate evidence, the charges made in his bill, and not merely to create inference, suspicion or doubt, which we think is all that he has done, even by his own witnesses, and leaving out of view the testimony of the numerous, weighty and unimpeachable witnesses who prove the truth of the positive statements made in the defendant's answer as to the conduct and motive of the complainant in procuring the alleged admissions from the defendant by threats of desertion

and disgrace and deprivation of her child if she would not confess, and by promises of condonement, forgiveness and happy reconciliation and the society and custody of her child and home if she would confess. "A confession forced from the mind by the flattery of hope or by the torture of fear, comes in so questionable a shape, when it is to be considered as the evidence of guilt, that no credit ought to be given to it, and therefore it is rejected." Greenleaf on Evidence, section 219.

"It is a principle, extending through all the departments of our law, that an act brought about by fraud or by duress, whoever the party may be, is void." The principle is that, when the will is taken captive and so does not act freely, the thing apparently done by it, yet not really so, shall not bind the doer. Now, in the relation of marriage, the husband is recognized by the law as, in a certain sense, holding the wife in subjection. See Bishop on the Law of Married Women, section 478. "One form in which the marital influence is brought to bear improperly upon the wife occurs where the husband threatens to separate from her." *Idem,* section 479. "Looking at the reason of things, if, as is well settled, a threat of injury to goods or other property, a threat of battery or of illegal imprisonment, are held sufficient to constitute duress, and to avoid a contract on the ground that they take away freedom of action and are calculated to overcome the mind of a person of ordinary firmness when believed in, it would seem too clear for argument that equal effect ought to be given to a threat by a husband to abandon his wife and turn her out upon the world to shift for herself, in the anomalous condition of a wife without a husband. If the degree of injury apprehended, and its almost remediless nature, are to be taken into account (and not to do so would be irrational), then certainly, in these respects, the abandonment of a wife by her husband is far in excess of a battery to the person or a trespass upon the goods, and stands upon stronger ground." *Tapley* v. *Tapley,*

10 Minnesota. "The wife is deemed the weaker party, and, as a sort of general rule, is excused for what she does through the husband's constraint." Bishop on the Law of Married Women; see section 479.

The bill charges no specific act of adultery—neither time, place, nor circumstance; and there is nothing in the testimony of the complainant's own witnesses as to any act of adultery. Even his three negro witnesses (one of whom, a servant boy, was proved, by respectable citizens of the neighborhood, to be utterly unworthy of belief on oath; and another, a negro woman who had been discharged from service by the defendant; and the third, a negro woman who, with her husband, had been, long years before, in the service of the defendant, and who is not corroborated by her husband,) testify only to certain acts of doubtful propriety; which, they say, occurred many years prior to their testifying in this suit; and which, with the alleged mention to one person, by one of them, after the lapse of a year, they never mentioned or remarked upon, in all that time; nor until drummed up by the complainant for the purposes of this suit. The complainant says that he and the defendant were married in April, 1879; "that during all said time to 1886 (March) he was true and faithful to his said wife, * * was kind, affectionate, and devoted to her, and was in her society as much as his business engagements would permit; and, until about the time of their separation, * * * March 18th, 1886, had confidence in her virtue, devotion, and fidelity to him." That his apprehensions in regard to his said wife's virtue and fidelity to him were first awakened in (March) the early part of 1886, by certain circumstances indicating that she was *enceinte*, which was followed soon after by a miscarriage. The record shows that the sickness to which, alone, he could refer, occurred about the middle of December, 1885; and, though both the physicians who attended her in that sickness were put upon the witness stand by the complainant, neither of them spoke of or referred to a miscarriage.

The bill charges the alleged pregnancy of his wife to the criminal intercourse of complainant's brother, J. Frank Hampton; though, during all the time, from the day of his marriage up to the separation in the middle of March, 1886, he was at his home, had free access to his wife, slept with her, was "kind, affectionate, and devoted to her;" had undoubting "confidence in her virtue, devotion, and fidelity to him;" and alleges no reason why he himself was not the cause of her pretended pregnancy. His brother, J. Frank Hampton, whom he charges to have caused the alleged pregnancy of the defendant (without a particle of proof to show access, or opportunity, or occasion), had married in December, 1884, and had moved away from his grandmother's homestead; where, up to his marriage, he had lived and managed the farm, in common with the complainant and the defendant; their grandmother, and their maiden aunt, all living as one family, and where the room,-which was occupied as a sleeping-room, by the complainant and his wife, was used by the family as the habitual sitting-room; and where the complainant and J. Frank Hampton (who were brothers and partners in business) kept their papers and transacted their mutual accounts—in the daytime and late at night. No presumption of guilt can be raised from the fact of J. Frank Hampton's being seen in this room, which was the family sitting-room and the business repository of himself and the complainant—his brother and partner. *Pollock* v. *Pollock*, 71 N. J., 137.

J. Frank Hampton was examined as a witness in this case, and his testimony, both in chief and on cross-examination at very great length and minuteness, is distinct, positive, consistent throughout, dignified and impressive. He denies wholly the charge of criminal, or even improper intercourse or familiarity with the defendant, ever or at any time, as made in the bill; and he utterly denies the familiarities, as testified to by the negro witnesses to have been observed by them five or more years previous to the 17th of March, 1886—the date of

complainant's first "apprehensions." In answer to the question, "When, where, and from whom did you first hear that your brother charged improper relations between his wife and yourself—give all the circumstances?" He said, "It was the 17th of March, 1886; it was at my mother's, and from her. The first of it was—Nick Hampton came to my house the night of the 17th of March, 1886, and asked me to go up home with him to see one of my sisters that was lying very low at the time, and also to settle a mill account on the road at Taylor's mill as we went. * * * We went on up to my mother's, then * * * I went in, and she said she had bad news to tell me. I asked her what it was. And she went on to tell me that Nick had accused me of being too intimate with his wife. I told her that he accused me wrongfully—that there was nothing of the kind. She went on with a history—to tell me about what I had been accused of; and I told her that there was not a word of it so. About that time Nick came in the room where we were, and she tried, in every way, to get me to acknowledge it, and she could not do it. I told her there was not a word of it so, and I couldn't acknowledge it. We talked there for an hour or two; raised quite a disturbance finally. We got into a little dispute—that is, me and Nick—and he said he didn't wish any trouble between me and him. I told him, all right, if he didn't want any trouble, I wouldn't urge any; that I was wrongfully accused, and was very mad. We then left that room, * * and we came into the bed-room adjoining; and we talked the matter over there for some time. He had taken his wife up there that same evening of the 17th, and ma told me some things his wife had said; that she had acknowledged to this before her; that she had first asked his wife the question in that same bed-room we were then in, and she didn't get a satisfactory answer; and then his wife went to the buggy to go home, and Nick didn't come out at that time, and ma went out to the buggy and asked her the same question out there, where, she said, she got

a satisfactory answer. We staid there until between 11 and 12 o'clock, when we started home. We talked of the matter as we went along, sometimes. He asked me what I supposed my wife was going to do when she heard this. I told him that she had too much sense to believe anything like this; and he said she would be pretty apt to leave you. We separated near my house that night. As we parted, I asked him to send for her father to meet at his house the next morning; and he said he would do it. The reason why I asked him to send for Mr. Stocks was, that I didn't believe she would acknowledge to anything of the kind in the presence of her father. The understanding was that I was to meet him (Mr. Stocks) down there at his house. When I saw Mr. Stocks go by, I started down there—me and my wife. When I got there, Mr. Stocks was there, and I found Mr. Stocks, Nick, and his wife, at the corn-crib. They were talking when me and my wife came up. They all spoke, and stood there a moment or so in silence. Nick began the conversation; first was he said, "Monemia, here is Frank and his wife, and your father; I want you to say what you have said, or you know your doom." She seemed to be in great distress, and commenced crying, and started to say something. Then my wife stepped towards her, and said, "Monemia, it must be some one else; it can't be Frank." And she said, in a crying and sobbing manner, "No—nobody." Well, about the time our conversation had ended—it was for a moment or two—Aunt Lydia stepped out of the house and came up towards us, to where we were, and my wife said to her when she got near enough, "Cousin Lydia, did you ever see anything wrong between Frank and Nick's wife?" and she said, "No, indeed; that she had no idea of such a thing; that she had never seen anything wrong between them at all." And my wife went on to tell Aunt Lydia that Nick accused me of being too intimate with his wife. She said "it was the first she had ever heard of it, and she had no idea of anything of the kind." Our main conversation broke up

about this time, and we separated. Mr. Stocks started home afoot, and Nick told him he could have his horse to ride home. ˙ Finally, he accepted of it, and rode home. Nick then asked his wife to get ready to go up home and have a talk with her mother. While he had the horses hitched, she got ready, got in the buggy, and he took her home, and there is where he left her." "He (Nick) has talked to me a good deal, a good many times; he has worked .every way to get me to acknowledge to it in way of talking to me. He told me about what the doctors told him was all the ground he had to go on. He said the doctors told him that there was an abortion."

This witness, in answer to the question how often he was in Mrs. Hampton, the defendant's room, and all the circumstances of his being there, said, "I was in there often; it was a room we used for a sitting-room; I kept my books—the books of the firm—in there; I kept the books myself, and occasionally a jug, when we had one; I went there to sit, and attend to my business there; I was there at all times—every night when I saw proper; he (my brother) and I used to sit up there together; the oldest child was not healthy—sick most of the time while it did live—and I used to help attend to it, at his request and her's, to help all I could; I sat up there, night after night,. with it."

This witness is fully corroborated by all the persons who were present at the meeting at the corn-crib (the details of which he has given), by Mahlon Stocks and Mrs. J. Frank Hampton. They both said that the complainant said to his wife, "Monemia, here is Frank and his wife and your father, say what you have already said, or you know your doom ;" and they all concur in saying that she, being greviously distressed, made some mumbling reply, not distinct at all ; and they all say that Lydia Nichols was not at or on the scene at that time, and that when she did come to them, she said in reply to Mr. J. Frank Hampton's statement and inquiry, if she had ever seen anything wrong between J. Frank Hamp-

ton and Nick's wife, that "she never had, and that she was surprised, and was at the first of it."

This witness, Lydia Nichols, is a spinster, 50 years of age, and the aunt of the complainant, and lived in the house with complainant and his wife all the time. She was a witness for complainant, and, having testified that she had observed undue and improper conduct between J. Frank Hampton and J. Nick Hampton's wife (of which she never apprised her nephew, J. Nick Hampton,) was asked, "What did you observe? When did you see any familiarities between Frank and Nick's wife, and state all that you know to induce such belief?" To which she answered, "I would see them sitting together, she sitting in his lap, talking together. She would go after him to the barn when he was out, and they were upstairs together." And then in answer to the question, "On what terms were you and Mrs. Hampton during the period from her marriage in 1879, to the separation in 1886?" She said, "We were on good terms, sometimes we had a word or two, but we got friendly again. *I had nothing against her.* I was not an enemy to her. I always waited on them and done what I could when she and the child were sick, and he, Elwood, was sick a heap. I always thought a great deal of the child and *her too,* and *that good opinion continued up to the separation.*"

The witnesses of the complainant (except the three negroes), testified of the defendant as an amiable, industrious, thrifty wife; kind and affectionate to her husband, and mindful of his interests; and it is remarkable, that in all the many years of her residence in that household, including J. Frank Hampton, where her husband placed her, no breath of suspicion went out against her that could reach the ears or the apprehensions of her husband, or of the numerous relatives and visitors of the family. James W. Nichols, the brother of Lydia Nichols, and the uncle of complainant, who says that he was often and familiarly at the house and in the room which Nick Hamp-

ton and his wife used as a bed-room, and also as a sitting-room, with Nick and his wife, and sometimes, Frank, in answer to the question, "Did you, or not, ever know, or see, or hear of anything otherwise than that she was an industrious and faithful wife up to the period of their separation?" Said, "No, I never saw anything to the contrary; never heard anything; don't remember that I ever did." Excepting this diabolical charge made against the defendant by the person, in the semblance of a man, who had promised to love and cherish, to shield and protect her, the whole record shows that she was a delicate, true and trusting wife.

It is fortunate, too, for this defendant—a *wife* and loving *mother*—whose mouth is closed against the grevious charges made by the husband and his negro witnesses, and who is debarred by a rule in law from giving (as she has done in her sworn answer), a full and satisfactory explanation of the expressions, and the letter wrung from her in the calamity of her situation, and dictated by the cunning promises and brutal threats and coercion of her accuser, that the record shows the *motive* and the *manner* of the appellee, J. Nick Hampton. He sold all his personal property, and by a deed dated 15th of March, 1886, and recorded the next day, he conveyed to his brother all his interest in a tract of land for which he received all the purchase-money in cash, $1,630; his wife, the defendant, uniting in the deed, upon the promise or suggestion that he had in view the purchase of a home in Mecklenburg county, and intended to take his family there to reside. Having achieved this posture, upon his return from Leesburg with the purchase-money on the 17th of March, 1886, he then breathed the first sus-suspicion (or "apprehension," as he expresses it), of his wife's in-infidelity, or of any conduct displeasing to him. And then, on the 18th of March, the day after the prepared and artful scene at the corn-crib, he takes her to her father's house, and there abandons her, he having the young child, Elwood, and all the money. This much the record shows outside of the wronged

wife's and mother's answer, which the hard technical rule of law will not permit to be used to show the conditions imposed upon the helpless woman, by which she could change or avert what he called her "doom." This *condition* is, however, clearly revealed to have been, that she was to confess and criminate J. Frank Hampton. James M. Stocks swears that on the 18th of March, 1886, J. Nick Hampton told him that Monemia and his brother Frank had been too intimate; that a day or two subsequent, he took his sister down to her husband's home at his father's direction, and at her request. That on the way down they met with J. Nick Hampton, and Monemia called to Nick and asked him, "Why he didn't come after her;" and he said, "Ha! ha! I've got that letter now. I carried it to Leesburg yesterday and showed it to several, and they all told me that I could get a divorce right away." We started on then towards the house where they lived, and he came up and said, we could not go to the house; and she asked him, "Why, what did he mean by this?" and he said "Madam, you can't go; I got locks and put on all the doors, and locked all the doors." And then Monemia commenced crying, and told him please to let her go to the house to get her clothes, that she had none. Nick told her, No, she couldn't. Then she looked towards the house and saw Elwood, her child, and begged him to let her go and see her child. "No, madam, you cannot. Then she begged him for her watch. He told her, No, that she would not get it." Then I got out of my buggy and handed him a letter that pa had sent to him. He opened the letter, cursed, and said, "You get but little of anything, you have not stuck to your promise." Then she was crying and fretting so that I started to turn around; and he begged me to come down of nights. I told him no, never, unless I was forced or brought by law. On the 10th of September, 1886, he sent a note, or message to his wife, asking her to meet him in the road. In about an hour and a half, she and her mother, having delayed long enough for him to

go away, as they wished, went out to a meeting going on in the neighborhood, and they met him at the gate sitting in his buggy. Mrs. Stocks says that "he got out and came up to us and shook hands, and asked us if we were going to the celebration, and where it was at?" And we told him "Arnold Grove." He said, "Monemia, I saw your brother Isaac the other day at the association at North Fork, and that he, Nick, told him, that he wanted you to come back and live with him; and Isaac, he said, told him he would never own her as a sister if she did; he said he did not care for that, if she would go." She said, "Nick, what did you tell all those stories on me for?" and he said, "It is true, I did undermine you very much. I went to Silcott's Springs and told a great many stories on you there, and you would be ashamed to go up there. I am sorry at the bottom of my heart, and would give everything I have if I hadn't done it." I (Mrs. Stocks), spoke up and said "Nick, the penitentiary is too good for you, you ought not to be running at large." She asked him why he told all them stories on Frank? and he said "he hated him; he had wronged him out of $400, and he intended to have it." He said the reason he told all those stories on her, was because "he did not want people to think he brought her home for nothing."

Isaac L. Stocks says, "Between the 10th and 15th of August, there was an Association of New-School Baptists at North Fork. I saw Mr. Hampton, and asked him about treating my sister so mean. He said he knew he had done it; he knew he had scandalized her, he was sorry for it, he was willing to take her back. I told him, never in this world. I said I would disown her as a sister if she went back to him."

The appellee admitted to Mrs. Stocks and to James L. Stocks, and to other witnesses in the record, that he had used unfair means—had undermined her—to get her to confess and criminate Frank Hampton. And yet the record shows that he did not himself believe his own story. He remained on friendly

and brotherly terms with Frank Hampton; visited him, worked with him, hunted with him, every day for months, and never did break with him until all his efforts and schemes had failed to get him to criminate his wife, and conspire with him to obtain this divorce. He brought this suit September 3d, 1887, and he has maintained it upon the evidence of negro servants, with some of whom he "bunked," smoked, drank, ate, slept, and associated; one of whom in testifying in this case says, "*Nick, there,*" did so and so. One of them testified to having seen through a key hole Frank Hampton in this room; another from the back yard, through the second-story window, that she put her arms around him; another, that on going up to the garret to get lard in the summer (where it was proved the lard was not kept), she saw Frank Hampton get up from the foot of the bed where he had been sitting, and Mrs. Hampton's clothes disordered, who had been nursing her sick baby, and the Boy Blue that he had seen her sitting in his lap, and all this, if true, as far back as 1880–1881, and of which they never spoke till called up and coached by J. N. Hampton to testify in this suit in 1887!

If the record did not attest the decree of the circuit court of Loudoun granting the divorce and declaring the adultery charged to have been fully established, it would be incredible, that *such circumstances*, only proved by such witnesses, had satisfied the guarded discretion of a reasonable and just mind to such a conclusion. Even if such testimony were not wholly discredited by the record, it would be destructive to the dearest of family ties, and the dignity and safety of society to permit it to have any weight after such a length of time. Our judgment is, that the decree complained of is wholly erroneous, and must be reversed and annulled; and the cause be remanded to the circuit court of Loudoun, with directions to dismiss the complainant's bill with costs to defendant, and a reasonable attorney's fee to her counsel.

DECREE REVERSED.