# Richmond

## C. D. HOLT V. CECIL T. HOLT.

November 20, 1939.

Record No. 2017.

Present, All the Justices.

*Paul H. Coleman, Bradley Roberts* and *J. Tinsley Coleman, Jr.,* for the appellant.

*George M. Warren* and *W. T. Spencer, Jr.,* for the appellee.

BROWNING, J., delivered the opinion of the court.

In February, 1937, C. D. Holt, the appellant here, and often referred to in the record as the complainant, instituted

a suit against Cecilia T. Holt, his wife, appellee here, and often referred to in the record as the respondent, and sometimes familiarly called "Cecil," for divorce from the bonds of matrimony on the ground of adultery.

The precise time or times of the alleged act or acts are not stated, nor the place, nor, with exactness, the person. A man, named Buchanan, is alleged to have visited the respondent at unseemly hours and that, at the time of his visits, no lights were on in the house and that these visits lasted sometimes as late as two o'clock, A. M., and that respondent had been seen with the said Buchanan in a parked automobile, ergo, the adultery charged was inferentially with him.

The respondent filed an answer denying the allegation of adultery, and charging that the complainant had, wilfully and without just cause, deserted and abandoned her and wholly failed and refused to support and maintain her under the pretense of believing her to have been unfaithful to him; and further charging him with the commission of the grossest cruelty and most inhuman treatment, to the point of mental and physical torture; and asking that her answer be treated as a cross-bill and that she be decreed a divorce *a mensa et thoro*.

A mass of testimony in the form of depositions with exhibits, consisting, in the main, of letters, was had and taken, and the case was argued and submitted for decision to the court. On April 12, 1938, a decree was entered denying the relief prayed for by the complainant and dismissing his bill.

A divorce *a mensa et thoro* was granted to Cecilia D. Holt, the cross-complainant. The custody and control of the four infant children was awarded to her and also permanent alimony, for the maintenance of herself and the children, in the sum of $300.00 per month, from April 1, 1938. Certain furniture that was in storage in Bristol, Virginia, was given to the cross-complainant, for the use and benefit of herself and the said children, and an attorney's fee was allowed her counsel, which, with what had already been paid, was in full for services rendered by him.

The decree also provided for the right of the cross-defendant to visit and contact the said children, at such reasonable times as he might desire.

An appeal from the said decree was allowed by one of the justices of this court; therefore, the case is before us.

It would be difficult for the most fecund mind to conceive a more sordid story of revolting details than that which is portrayed in the testimony in this case. To recite it would be to give permanent form to a chapter which, for all time, would inflict anguish and shame upon innocent persons. There could be no justification for the recital here of things which would shock every sense of delicacy and refinement.

It is always incumbent upon one to prove the case alleged in his bill of complaint. As the offense here is an unnatural one and involves the commission of a crime, the proof offered to establish it must be such as would "lead the guarded discretion of a reasonable and just man to a conclusion of guilt." This was the wise observation of Lord Stowell in *Loveden* v. *Loveden,* 2 Hag. Con. 2. It is quoted and adopted by this court in the cases of *Throckmorton* v. *Throckmorton,* 86 Va. 768, 11 S. E. 289, 290; *Johnson* v. *Johnson,* 154 Va. 788, 153 S. E. 670; and *Kirby* v. *Kirby,* 159 Va. 544, 555, 166 S. E. 484, 487.

In the latter case we find this quotation: "In 2 Bishop on Marriage, Divorce and Separation, sections 1359, 1360, the rule is thus stated: 'The rule for the sufficiency of the proven facts to infer adultery is that, if they are not reasonably reconcilable with the assumption of innocence yet are so with that of guilt, the conclusion of guilt will be authorized. But it will not be if either they can be reasonably reconciled with innocence, or cannot with guilt. Circumstances merely suspicious are inadequate, though there are degrees of imprudence from which the offense will be presumed. Still care and circumspection should attend all dealings with this class of evidence.' "

A careful and critical examination of the evidence, in this case, relied upon to establish the charge forces us to the same conclusion as that reached by the chancellor.

We have here a married man and a married woman as the actors in the drama. He is a dealer in furniture and especially familiar with that of the second-hand type, now so esteemed and valued as antiques. She has become so interested in the subject that she may be termed a collector and she has sought his advice a number of times in the matter. It appears that he loaned her some articles of furniture of the sort referred to, which were used in her own home, with the knowledge of her husband. A pathetic incident which appears is that, during the time of the unhappy disruption here, she was indebted to this man for a chest of antique nature which she had purchased as a Christmas present for her husband. It was said that she was seen on a number of occasions in his place of business talking to him and that she called for him over the telephone and sometimes he would tell the person delivering the call to say that he was out. There was testimony that a Mrs. Everett, whose husband conducted a restaurant, where she occasionally was, said that this married woman sometimes called the man, using the restaurant telephone. It also appears that he drove a business truck which carries his firm name in plain lettering on its sides and that this truck was parked in the neighborhood of her home on numerous occasions at night, and that while this truck has been so parked some of the curious and solicitous neighbors were unable to descry lights in the home of the married woman. He lived only three squares from her home, and if traffic conditions and parking facilities in Bristol are similar to those in every other like municipality, that is, congested to an extreme degree, it is not important as to where he parked his truck. It further appears that he has been seen on the front porch in the daytime as well as at night, the latter once as late as eleven o'clock, and that, upon one occasion, she was driving with him in an automobile. There was some vague and unimpressive testimony that the man's truck was seen near the woman's home at about twelve o'clock at night and that voices in muffled tones were heard, but they were unidentified, and that the truck was driven away, on one night, by some unknown person as late

as two o'clock in the morning. On the night of August 13, 1936, this truck was parked in front of a Mrs. Wilson's residence. It was without lights and annoyed Mrs. Wilson, who had heard rumors of clandestine communications between these two persons, and she called the police, who came, and while the two policemen were talking to some of the neighbors the man in question came from the direction of Park Street, which was the street on which the woman lived, and got in the truck and drove away. Each of these married persons lived with his respective spouse and had children and, to all intents and purposes, were happy in their domestic relations. The woman we have been referring to was the defendant in the suit for divorce based on the ground of adultery, and the man was named as the person with whom the offense was committed.

The woman's husband was employed during the year 1936 in the state of Tennessee, and in the early part of August of that year he was to spend the week-end in the city of Nashville, from which place his business took him into portions of the state of Kentucky. He traveled by motor. The woman, his wife, at the time was visiting her father and mother in Lynchburg, Virginia, and it was arranged that she would leave Lynchburg and spend the week-end in Nashville with him and accompany him on some of his business trips. Her route was by Bristol because she could travel that far with some friends who were driving to Bristol and the expense would be negligible. In order to take advantage of this method of getting to Bristol she had to leave Lynchburg on the particular day, which necessitated being in Bristol for two nights en route, the appointed time to meet her husband being two days later. This was known to her husband and was at his direction.

The first night at Bristol she spent with a friend, Mrs. Wilkes. She intended staying the second night with another of her friends, for she had been informed that the bus, which she planned to take for Nashville, left at nine o'clock in the morning, which was a comfortable hour to have breakfast and leave one's house. It was what is known

among shoppers as dollar day at the stores and after shopping around with some of her friends she went to her own home to rest, when a letter from her husband was delivered to her asking her to let him know just what she was going to do. She had then just thirty minutes, barely time to write him, dress and get to the post office for a stamp and then to the train to mail a letter which would reach him in time. She had dinner with Mrs. Wilkes and then telephoned about the bus and found out that she had been misinformed, that the leaving hour was seven-thirty rather than nine o'clock. This being the case, she thought it best to spend the night at home, where she could pack her things and leave early the next morning. She had before called two of her friends, with one of whom she had thought she might stay, but neither of them was at home. The man in question stopped by at about nine-thirty and sat on her porch until about eleven. This was the night that Mrs. Wilson called the police after she and some of the neighbors had consulted about the truck and its owner and his whereabouts.

This seems to be a full and fair statement of the incidents between these two persons which led to the dastardly act which was the immediate cause of the disruption of the marital relations between the woman and her husband. An anonymous letter was sent to the husband, which reached him just after his wife had said goodbye to him in Kentucky and returned to Lynchburg, after the visit at Nashville with him, which was without incident, except the most pleasant. This letter was indecent and scurrilous in the extreme. It charged his wife with adultery with the man in question in terms which only one, who was too cowardly to reveal his identity, could employ.

The husband's disposition of this letter will be presently referred to. It is sufficient, at this moment, to say that when he wrote her demanding that she answer certain questions as to her doings in Bristol during the two days and nights, which have been mentioned, she replied at length, but she was not frank as to the incident connected with the man

with whom she was accused. She said that he had never been to her house at night. This was false. The anonymous letter, and his disposition of it, and his letters to her mother, and to her, dealt her a crushing blow. The whole thing was like a thunderbolt from a clear sky. She was facing a tremendous crisis. She failed in that she compromised with the truth. This cannot be overlooked. It is to be deplored. It is in evidence, too, that she called the Wilkes home and asked that Mrs. Wilkes say to her husband that she spent both nights at her house. It is but an illustration of the "tangled web we weave when first we practice to deceive."

We have stated the case as strongly as we can from the angle of the complainant that we may approach a conclusion with a calm and clear conception of the value of the evidence as bearing upon the charge alleged. Giving to all of the evidence all of the probative value to which it is entitled, or which may be legally ascribed to it, will "the guarded discretion of a reasonable and just man" be led to the conclusion that the woman has been guilty of adultery? We think not. All that the evidence shows she has done, in connection with the man who is alleged to be her paramour, is consistent with her innocence—not innocence of suspicion, nor of imprudence, nor of questionable conduct—but innocence of adultery. We say this in the consciousness of the fact that she did not deny that he had put his hands on her. She did deny that he had done it in an ungentlemanly way.

In the social complex men and women, and their acts, short of downright culpability, must be measured by the rules which govern human conduct and which are known to common observation and experience as of today. Nothing in life is static. What one generation condemns, a succeeding one countenances. Habits, customs, conditions, values, proportions, people change. Only a few elements are "the same, yesterday, today and forever." A great thinker said that the most pathetic being is a changeless person in a changing world. The thought and the convic-

tion is that, however reprehensible the conduct of the persons here concerned would have been held to be a quarter of a century ago, today it is accounted perfectly consistent with purity of character and innocence of criminality. Who can say else than that the present order is an advance step toward a larger measure of truth and justice.

■■ In treating the subject of divorce on the ground of adultery and the effect of circumstantial evidence of the offense, it is said in American Jurisprudence, Vol. 17, section 397, page 344:

"The courts must, perforce, take such evidence as the nature of the case permits—circumstantial, direct, or positive—and bring to bear upon it the experiences and observations of life, thus weighing it with prudence and care and giving effect to its just preponderance. Still, it has been said in weighing the effect of such evidence that it must be so clear and strong as to carry conviction of the truth of the charge, and if it does no more than raise a suspicion of chastity, it is insufficient, and that the circumstances must lead to it not only by a fair inference, but as a necessary conclusion."

In thinking of the wife in this case, and her failure to avow in truth the whole matter, we are constrained to say that we can conceive of no greater stress than she was under. Her husband had spread abroad the anonymous letter. He had declared that he believed every word of it. He forbade her to return to his home. He wrote to her mother that she (his wife) was not "fit to raise a puppy;" that he had notified the public that he would not be responsible for any obligations she might incur; that she must now "map out her own plans." They had been married for sixteen years. There had been born to them four children, three of whom had grown nearly to young manhood, and a little girl just out of babyhood. This is what Mrs. W. E. Martin, the wife of the president of Sullins College, said of her:

"I thought Mrs. Holt was a remarkable woman good home-maker, Mr. Warren. I often spoke in my family about how

unusual it seemed to me for a woman so young as she was to give as much time and thought to her family as she did to hers. She rented from us and she took excellent care of the property and she gave a great deal of time to her husband and I thought a great deal more than the average woman in this generation."

\*    \*    \*    \*    \*    \*    \*

"She didn't have a great many clothes. She sewed a great deal herself and did a great deal of sewing for the children, but she didn't seem to spend as much on herself as she did on her home. She was always attractive in her appearance. She had a very young negro girl who helped her and other than that she did all the work herself, and I never was impressed with the fact that she had a great many clothes herself, but she was attractive and looked nice in her clothes.

\*    \*    \*    \*    \*    \*    \*

"I feel she was an unusually devoted mother to her children; she was very much interested in her children and took a great interest in her children. Practically all the visits I had with her, her conversations were about her feeling toward them and devotion to her husband."

The Holts were tenants of Mrs. Martin for eight years and the house in which they lived was adjacent to the college grounds.

This is a graphic picture of the woman who was discarded by her husband because a charge was made against her character in an anonymous letter by some unknown person, who would not assume the responsibility for his utterances. Thus this mother faced separation from her children, ejectment from her home and repudiation by her husband. Is there not some palliation for the weak spot in her armor of defense, to which we have referred? How wise and merciful it seems that prevarication is not one of the constituents of the decalogue.

The chancellor was right in decreeing a divorce *a mensa et thoro* to Mrs. Holt on the ground of cruelty and desertion.

It would lengthen too much this opinion were we to go into the evidence in detail bearing upon this feature of the case. It is enough to say that the record teems with evidence which sustains the ruling. The husband's letters to his wife and to others afford a truer picture of the man than others could draw. They are full of profane abuse, obscene and intemperate vilifications of the wife of his bosom and the mother of his children.

But we are told that these letters are not admissible as evidence. Subtle reasoning and ingenious and clever argument is employed by counsel who urge that the admission of them as evidence offends the statute which is section 5106 of the Code. This statute is practically what it was nearly seventy years ago when this court considered it in the case of *Bailey* v. *Bailey*, 21 Gratt. (62 Va.) 43, 49.

" * * But, upon the threshold of this enquiry, we are met with a question which must first be disposed of. The evidence contained in the record, in the main made up of letters, of both the plaintiff and defendant, filed and relied upon by the plaintiff. It is insisted by the learned counsel for the defendant, that these letters are but the declarations and admissions of the parties, and cannot, by the express terms of the statute, be regarded as evidence in the cause. They rely upon that provision of the statute which declares that 'such suit shall be instituted and conducted as other suits in equity, except that the bill shall not be taken for confessed; and whether the defendant answer or not, the cause shall be heard independently of the admissions of either party in the pleadings or otherwise.' * * * If the construction contended for by the learned counsel for the appellant be the true one, then everything that the parties write, everything that the parties say, no matter under what circumstances, must not be read or heard by the court, because they are the admissions of the parties, and under the operation of the words of the section 'or otherwise' must be excluded. So that, according to this construction, in a suit for divorce upon the charge of adultery, the letters of the guilty party to his or her paramour, written at a time

when the other party was living in the unsuspecting confidence and happy security of conjugal fidelity and affection, could not be read in evidence in behalf of the injured party. Or if the ground alleged be desertion, letters from the husband ordering the wife from home under threats of violence, plainly expressing his purpose not to provide for her support, and deliberately declaring his intention to desert her forever, according to the theory of the counsel, such a letter could not be read in evidence in behalf of the wife; and in the one case, though the guilt of the party is acknowledged and unquestioned, the court cannot lend its aid to sever a connection which by the laws of God and man it is a crime to continue; and in the other, the helpless and deserted wife is to be turned out upon the cold charities of the world without the right or the power to have appropriated to her support one dollar of her husband's estate, though it all might have been derived from her. These would be the unjust and absurd results to which such a construction of the statute would inevitably lead. * * * We are of opinion that the letters of the parties may be admitted in evidence in a suit for divorce (except where it is shown they were written by collusion for the purpose of obtaining a divorce) just as in any other case, for the purpose of proving, or as tending to prove facts pertinent to the question which the court is called upon to decide, to have precisely the same weight as in other cases. The question which the court was called upon to decide in this case was whether James A. Bailey had abandoned and deserted his wife. One of the constituent elements of the offence of desertion, being the intent to desert, in the mind of the offender, we think the letters of the parties may be read as evidence of that intent. Their genuineness is not impeached nor attempted to be impeached by the evidence in the cause."

We are not advised that this case has been overruled in this State. If the case of *Hampton* v. *Hampton*, 87 Va. 148, 12 S. E. 340, has that effect, then that case is hereby overruled.

The evidence in this case fully warrants the ruling of the chancellor as to the custody of the children and the amount of alimony decreed to be paid by the cross-defendant. We think that Mr. Holt should be required to pay to counsel for Mrs. Holt their reasonable expenses incurred in this litigation. We are of the opinion that a fee of $300.00, in addition to what has already been paid on this account, should be paid by Mr. Holt to Mrs. Holt's attorneys to be divided as they may choose. In our judgment, Mrs. Holt's interests under the circumstances of the case reasonably required the services of both of her attorneys.

We affirm the decree of the court, subject to the modifications referred to.

*Affirmed and remanded.*