## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

MAMIE F. FULTON v. ROBERT R. FULTON.

January 21, 1952.

Record No. 3844.

Present, All the Justices.

The opinon states the case.

*Dodson & Pence* and *Jack B. Coulter,* for the appellant.

*J. W. Lindsey* and *Hunter & Fox,* for the appellee.

SMITH, J., delivered the opinion of the court.

A suit for divorce *a vinculo matrimonii* on the ground of adultery was instituted by Robert R. Fulton against Mamie F. Fulton on August 25, 1948. Mrs. Fulton filed an answer and cross-bill denying the allegations of adultery and prayed for a divorce *a mensa et thoro* on the ground of cruelty.

Many witnesses were heard, their testimony being taken by depositions, and on July 6, 1950, the trial court entered its decree dismissing the defendant's cross-bill and awarding the complainant a divorce *a vinculo matrimonii.*

Mrs. Fulton, the appellant, assigns the following errors: (1) The granting of a divorce *a vinculo* on the ground of adultery was contrary to the law and evidence. (2) The dismissal of defendant's cross-bill and refusal to grant a divorce *a mensa* on the ground of cruelty was contrary to the law and evidence. (3) The refusal to allow further examination of witness Garland Y. Hudson.

The crucial issue presented for decision is whether the adultery of the wife has been proven in the manner required by law. The proof of this issue is based on the testimony of an alleged eyewitness to the act, corroborated by evidence of the conduct and actions of the participants before and after the alleged act.

The appellant, age fifty-three and the mother of four adult children by a prior marriage, first met the complainant, age forty-seven, in 1938. In January of 1947, Fulton secured a divorce from his then wife and on May 28, 1947, he and the appellant were married in Roanoke.

Mrs. Fulton was charged with having committed adultery with one Clarence LaPrad on April 10, 1948. The adultery was alleged to have taken place outside the city of Roanoke just off a seldom-used path which runs through a thicket from a sparsely-settled community known as Jackson Park to the Lynchburg-Roanoke highway. This was a thicket of pines, locust and honeysuckle, and of such density that persons could conceal themselves nine or ten feet from the path.

It is contended that Mrs. Fulton met LaPrad in 1945, when they were together in the home of her brother, Marvin (Jack)

Moore during which time, as Mrs. Marvin Moore testified, they were drinking and Mrs. Fulton sat on LaPrad's lap and hugged and kissed him. She denied having known LaPrad prior to the date of the alleged adultery, but LaPrad testified he met her for the first time eight or ten years before at Jack Moore's house.

On the morning of the alleged adultery Mr. and Mrs. Fulton had returned from a trip and he had not intended to go to work that day, but Mrs. Fulton insisted that he go to the office and get away from the house. Previous to his departure he had offered to take his wife and her daughter to the cemetery to visit the grave of her first husband who had died the preceding week. Upon his return about 12.15 p. m., Fulton found his wife had been drinking and was quarrelsome. She again told him to get away from the house, that she had another date that afternoon, that someone else was going to take her to the cemetery. Mrs. Fulton does not deny that she had been drinking, but she does contend that she was not drunk. She claims he accused her of being drunk and threatened her with arrest, so she, without notifying her daughter, changed her mind about going to the cemetery, and called a taxi cab to take her to the home of her brother and sister-in-law, Claude and Beulah Moore, who lived in Jackson Park.

About five minutes before Mrs. Fulton arrived at the Moore home, Clarence LaPrad had appeared and was talking to Beulah Moore through the screen door when appellant arrived. All three entered the house and Mrs. Moore testified that Mrs. Fulton, after giving LaPrad a drink of whiskey from a bottle she had in her purse, went over to him, put her arms around him, hugged and kissed him, and called him a "great big hunk of man."

Beulah Moore was at home alone and not particularly liking the looks of the situation, she went to a neighbor's house and telephoned for her brother-in-law (appellant's brother) Marvin T. Moore, to come to her place.

Mrs. Moore states that after she had called Marvin Moore and was walking up the road past Garland Y. Hudson's home she saw Mrs. Fulton and LaPrad going out the road. She asked Hudson to see where LaPrad was taking Mrs. Fulton as she didn't want any harm to come to her. At Beulah Moore's request, Hudson went to the top of the hill and described what he

saw as follows: "They were both laying down on the ground. The man was on top of the woman. They were laying there." When asked to describe the position of their bodies he said: "I could see all of the man, his head, feet, legs, body and all. All I could see of the woman was the first part of her feet and legs, about this much (indicating), that was all I could see." Hudson further testified that he was within ten or fifteen feet of the couple and watched them for two or three minutes before returning to his home.

Shortly thereafter Marvin Moore and hs wife, Helen, arrived in response to Beulah Moore's call and found Mrs. Fulton and LaPrad coming up the road. Marvin picked up his sister and LaPrad and drove over to the Fulton residence in another section of Roanoke. Marvin Moore testified that while in the car Mrs. Fulton referred to LaPrad as "you great big handsome man" and Helen Moore testified that Mrs. Fulton's dress "was all wrinkled and dirty, her hose were torn and dirty, and her legs were scratched."

Later that afternoon Fulton rode over to Beulah Moore's home and when he arrived LaPrad was there and spoke to him saying, "where is Mamie, I have a date with Mamie."

There was conflict in the testimony, but under elementary principles we are bound to affirm the decree of the trial court if supported by credible evidence.

In Virginia adultery in a suit for divorce must be proven by evidence sufficient to lead the guarded discretion of a reasonable and just man to the conclusion of guilt. *Bowen* v. *Pernell,* 190 Va. 389, 57 S. E. (2d) 36; *Haskins v. Haskins,* 188 Va. 525, 50 S. E. (2d) 437; *Holt* v. *Holt,* 174 Va. 120, 5 S. E. (2d) 504.

Counsel for the appellant earnestly argue that adultery has not been clearly and convincingly proven, that the wife's actions and behavior are reconcilable with innocence, and that the testimony is inconclusive and untrustworthy. It is contended that she was upset and drinking, but not drunk, and that her meeting with LaPrad at the Moore home was a coincidence. She denies showing affection for him and explains that her being on the ground near the path was the result of a fall at which time her purse came open and spilled its contents on the ground and that she sat down while LaPrad picked up the contents of the pocket book.

If the testimony of Hudson is worthy of belief, there is only one inference to be drawn from it and that is guilt of adultery.

Hudson was keeping watch at the request of Beulah Moore. He was subjected to a searching cross-examination by able and experienced counsel, his testimony shows no indication that it is untrustworthy or inconclusive, and the surrounding circumstances tend to corroborate it. Shortly after her arrival at the Moore home, Mrs. Fulton gave LaPrad a drink of whiskey out of a bottle she had in her purse, they hugged and kissed and soon left the house for the place where Hudson saw them. The corroboration comes almost wholly from witnesses who are brothers and sisters-in-law of Mrs. Fulton. Their testimony shows conduct on the part of the wife that strengthens and gives support to the direct testimony of Hudson.

When the combined facts and circumstances, including the explanations offered by the wife, are considered from the standpoint of common human experience, the charge of adultery is proved.

The evidence further shows that the alleged cruel conduct of the husband was the direct result of the intolerable behavior of Mrs. Fulton when under the influence of intoxicants. The evidence is insufficient to support the charge of cruelty.

The final assignment of error is the refusal of the trial court to allow further examination of the witness, Hudson.

Hudson's testimony was taken by deposition on October 18, 1948, at which time he was subjected to cross-examination by defendant's attorney which in the printed record covers about fourteen pages. During the course of the taking of the depositions a period of nineteen months elapsed. Following the taking of the final evidence on May 17, 1950, both sides rested. On June 13, 1950, the trial judge wrote the attorneys of his decision. The only mention we can find in the record of appellant's motion to re-cross-examine Hudson *ore tenus* is in the trial court's decree of July 6, 1950, and apparently this motion was made after June 13, 1950. Whether or not evidence in a chancery cause will be heard orally before the court rests in the discretion of the trial court. Code of Virginia, 1950, § 8-310. See also Rules of Court 2:21. There was no abuse of the trial court's discretion in denying the motion.

We cannot say that the trial court's holding was contrary to the weight of the evidence, therefore, the decree is affirmed.

All costs of this appeal, including an attorney's fee of $200.00 to counsel for the appellant, are to be taxed against and paid by the appellee.                              *Affirmed.*